**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Marilyn Kelly

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway

FILED JULY 14, 2009

In re JL, Minor.

_____

DEPARTMENT OF HUMAN SERVICES,

      Petitioner-Appellee,

v

No. 137653

CHERYL LYNN LEE,

      Respondent-Appellant,

and

SAULT STE. MARIE TRIBE OF
CHIPPEWA INDIANS,

      Intervening Respondent-
Appellee.

_____

BEFORE THE ENTIRE BENCH

CORRIGAN, J.

Respondent Cheryl Lee challenges the judgment of the Court of Appeals

affirming the termination of her parental rights to her son, JL. *In re Lee*,

unpublished opinion per curiam of the Court of Appeals, issued October 16, 2008

(Docket No. 283038). Respondent specifically claims error in the interpretation

and application of the Indian Child Welfare Act (ICWA), 25 USC 1901 *et seq.*

She urges us to adopt the interpretation of the ICWA offered by the dissenting Court of Appeals judge. We affirm the judgment of the Court of Appeals because petitioner the Department of Human Services (DHS), provided timely, affirmative efforts that satisfied the ICWA's "active efforts" requirement, 25 USC 1912(d). We hold that the ICWA requires the DHS to undertake a thorough, contemporaneous assessment of the services provided to the parent in the past and the parent's response to those services before seeking to terminate parental rights without having offered additional services. The ICWA does not, however, categorically require the DHS to provide services each time a new termination proceeding is commenced against a parent. We further reject respondent's claim that the lower courts applied a conclusive presumption of unfitness based on her past conduct in determining that respondent's continued custody was "likely to result in serious emotional or physical damage to the child." 25 USC 1912(f). Finally, we conclude that this determination was supported by evidence beyond a reasonable doubt, as required by 25 USC 1912(f).

## I. Basic Facts and Procedural History

Respondent and her son, JL, are both members of the Sault Ste. Marie Tribe of Chippewa Indians. Between 1999 and 2006, respondent gave birth to four children: JL, SD, JD, and BP. JL is the oldest child. Respondent's parental rights to SD, JD, and BP were terminated in earlier proceedings that are not at issue here.

JL was born in 1999, when respondent was 16 years old and living in foster care. DHS Child Protective Services (CPS) worker Regina Frazier began working

2

with respondent in 1998, even before respondent had children. Respondent was then both a delinquent and a victim of abuse and neglect. Respondent displayed abusive and neglectful behavior after JL's birth, so he was removed from respondent's care in September 2000. Frazier provided wraparound services[1] until respondent moved to Sault Ste. Marie. The Sault Ste. Marie Tribe of Chippewa Indians Tribal Court assumed jurisdiction over the case in March 2002. The tribal court released JL from its jurisdiction in August 2002, when he was placed in a limited guardianship with his paternal grandmother, Lois Plank. Meanwhile, respondent gave birth to a daughter, SD, on November 24, 2001.

Anishinabek Community Family Services caseworker Penny Clark began working with respondent in 2002, when she was 18 years old and living on a reservation. Clark, who was respondent's wraparound coordinator, and several others attempted to help respondent care for SD, who was then a few months old. Clark also worked with respondent on budgeting and helped her obtain social security benefits. Although Clark enjoyed working with respondent, Clark testified that respondent could be moody and impulsive and that her impulsiveness led to trouble. Under the Family Continuity Program, Clark visited respondent in her home at least once a week. Respondent's home was often messy and unsafe; glass and cigarette butts were left within SD's reach. Clark also had concerns

---

[1] Frazier testified that the wraparound program works with families who receive services from multiple agencies to coordinate those services.

3

about respondent's ability to care for herself. At times, respondent was depressed; she failed to eat and take prenatal vitamins.

JL was returned to respondent's care in September 2003. Her third child, JD, was born on January 11, 2004, while Clark was still working with respondent. When Jill Thompson, a caseworker with the Binogii Placement Agency, began working with respondent in July 2004, three children—JL, SD, and JD—lived with respondent and Justin DuFresne, the father of SD and JD. Respondent and DuFresne failed to supervise the children; instead, JL, then five years old, was supervising his younger siblings. SD wandered into the road multiple times. Caseworkers Thompson and Clark tried to remedy this problem. Clark even installed latches on the front door so that the children could not run out. The condition of the home "ran the gamut from poor housekeeping to filthy." Like Clark, Thompson described cigarette butts on the floor and the presence of choking hazards to young children.

Respondent could not manage her finances and never sought employment. A "payee" managed respondent's finances by paying her bills with the money from respondent's social security disability payments and then giving respondent a $50 weekly allowance. Respondent purchased rent-to-own furniture that cost $30 or $35 a week. She could not afford diapers and other necessary items.

Despite the extensive efforts of Thompson and Clark, the children were removed from respondent's home in 2004. At that time, JL again became a ward of the tribal court and was again placed with his grandmother, Lois Plank. In

4

November 2004, the trial court awarded JL's father, Tony Plank, full physical custody of JL and awarded respondent and Tony Plank shared legal custody. The court also granted respondent unsupervised visitation rights. After SD and JD were returned to respondent's care, Thompson and Clark provided services in an effort to keep them in her home, but they were observed in the street at night and were again removed in August 2005.

When Clark closed respondent's case in 2005, she had provided all the services she could offer "without staying there 24/7." She opined that respondent had not made significant improvement. Clark participated in the termination trial involving SD and JD that was initiated because respondent had failed to supervise them. The tribal court terminated respondent's parental rights to SD and JD on June 30, 2006.[2] Respondent gave birth to another child, BP, on July 20, 2006.[3] BP was removed from respondent's care shortly after her birth. Melissa VanLuven, who was the child placement services supervisor for the Sault Ste. Marie tribe and the caseworker supervisor of Thompson and Clark, participated in

_____

[2] Respondent appealed the tribal court's termination order. The order was vacated on January 9, 2009, by the Sault Ste. Marie Tribe of Chippewa Indians Appellate Court. That court found that the lower court erroneously considered all the allegations against both respondent and the children's father, Justin DuFresne, when deciding to terminate respondent's parental rights, even though the two were estranged at the time of the termination proceedings. The matter was remanded for the lower court to "take such proofs as it deems appropriate as to the fitness of [respondent] alone . . . and determine what further order, if any, should be entered with regard to the parental rights of [respondent]." The parties have provided no documentation of the tribal court's disposition of the matter on remand.

[3] Michael Plank, respondent's current partner and Tony Plank's brother, is BP's biological father.

the decision to petition for termination of respondent's parental rights to BP. That decision was based on an assessment of the tribe and the caseworkers that, despite the provision of services, respondent's children could not safely live in her home. The tribal court terminated respondent's parental rights to BP on January 8, 2007.

In spring 2007, the trial court granted respondent's motion for parenting time, allowing her weekly unsupervised visitation with JL. In July 2007, however, the DHS petitioned to terminate respondent's parental rights to JL on the basis of respondent's "children's protective service history" beginning on September 12, 2000, specifically citing the termination of her parental rights to SD, JD, and BP.[4] The DHS filed a supplemental petition on August 20, 2007, alleging that proceedings to terminate Michael Plank's parental rights to BP were pending. The supplemental petition also alleged that Michael Plank had a history of physically abusing and neglecting two other children. In addition, the petition provided:

---

[4] Both the initial and supplemental termination petitions cited MCL 722.638(1)(b)(i), which provides:

> (1) The department shall submit a petition for authorization by the court under section 2(b) of chapter XIIA of 1939 PA 288, MCL 712A.2, if 1 or more of the following apply:
>
> * * *
>
> (b) The department determines that there is risk of harm to the child and either of the following is true:
>
> (i) The parent's rights to another child were terminated as a result of proceedings under section 2(b) of chapter XIIA of 1939 PA 288, MCL 712A.2, or a similar law of another state.

6

8. Cultuarlly [sic] appropriate services were provided to [respondent] for over six years, including Prevention, CPS, and Wraparound Services through Mackinac County; Protective Services, foster case services, and prevention through the [Sault Ste. Marie] Tribe, CPS services through Chippewa County DHS and CPS services through the Children's Aid in Canada. [Respondent] has also participated in the Families First Program three times, Wraparound and Family Continuity through the [Sault Ste. Marie] Tribe, Parenting Classes twice with [Sault Ste. Marie] Tribe, once through [the Strong Families/Safe Children Program], and once through the Indian Outreach Program. Although these services were offered and somewhat complied with at times, [respondent] continued to abuse and neglect her children, which led to her rights being terminated.

9. According to [respondent], she receives Social Security Disability due to having fetal alcohol syndrome. According to the National Organization of Fetal Alcohol Syndrome, the majority of persons with FAS have life-long difficulties with learning, attention, memory, and problem solving.

The supplemental petition also cited the criminal histories of respondent and Michael Plank, including respondent's 2005 and 2006 misdemeanor convictions for operating a motor vehicle while impaired and an aggravated assault conviction stemming "from a 2005 bar incident," as well as Michael Plank's August 2000 guilty plea to felony assault charges. The petition also observed that Tony Plank had been convicted of third-degree criminal sexual conduct and incarcerated.[5] Respondent denied the allegations in the petition.

At trial, caseworkers Frazier, Clark, and Thompson described the extensive services they and their agencies provided to respondent from 1999 to 2005. They

---

[5] The trial court terminated Tony Plank's parental rights to JL on May 13, 2008.

7

testified that, despite these services, respondent failed to become an adequate parent. On the basis of her experience with respondent, Clark did not believe that respondent could appropriately care for JL full-time. She opined that termination of respondent's parental rights was in JL's best interests. Testifying as an Indian expert under 25 USC 1912(f),[6] VanLuven stated that she was satisfied that active and reasonable efforts had been provided to prevent the termination of respondent's parental rights and that respondent's custody of JL would result in serious emotional or physical damage to him.

Respondent testified that she lived in "a cozy little log house" with Michael Plank and that she had recently completed substance abuse counseling. She had also voluntarily attended and completed parenting classes offered by the tribe. In her view, she had learned from the parenting classes how to "safely raise a child in today's society." She also testified that she visited JL as much as possible, at least twice weekly, and celebrated holidays with him. She testified that Michael Plank and JL had a good relationship and that they hunted, fished, and played together. Respondent denied that Michael Plank had ever been violent with her or JL. She

---

[6] 25 USC 1912(f) provides:

> No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

8

acknowledged, however, that Michael Plank had been convicted of assault after the mother of his other children accused him of being violent. Respondent offered to do whatever was necessary to continue her relationship with JL. She was concerned that if her parental rights were terminated she would have to "suck up to Lois [Plank] forever in order to stay in [JL]'s life."

On cross-examination, respondent admitted that she had not worked or sought work in four years. She received social security benefits because she had been diagnosed with fetal alcohol syndrome. "They" believe she had a disability and was incapable of working. Although she acknowledged a possible learning disability, she believed herself capable of working. Respondent acknowledged her convictions of operating a motor vehicle while impaired and aggravated assault.

Eight-year-old JL testified that he liked spending time with respondent and that it was "just the usual," explaining that it was "kind of like when I'm with my Grandma, except being with a different person." He loved and missed respondent and said he would like to spend more time with her, but also said that it was difficult to answer whether he would like to live with her because he liked living with his grandmother. He also liked spending time with Michael Plank and had no fear of him.

Addictions therapist Gary Matheny had counseled respondent weekly for about eight months. Respondent was now "clean and sober." He and respondent had discussed parenting skills, including the need for proper structure in the household and the need to avoid drinking, drugs, and fighting. Respondent's

9

inability to get along with her "significant others" had caused many problems. Respondent had been raised in an alcoholic family, had been taken from home as a child, and had early unhealthy relationships as well as an early pregnancy. Matheny believed, however, that she had "[v]astly" overcome those background influences. He saw no symptoms of fetal alcohol syndrome in respondent, but believed she possibly suffered symptoms of "[f]etal [a]lcohol [a]ffects [sic]."[7]

The trial court terminated respondent's parental rights to JL. It found that the DHS had established grounds for termination under MCL 712A.19b(3)(i)[8] by

---

[7] According to the National Organization on Fetal Alcohol Syndrome, fetal alcohol syndrome (FAS) "is a set of physical and mental birth defects that can result when a woman drinks alcohol during her pregnancy." It "is characterized by brain damage, facial deformities, and growth deficits. Heart, liver, and kidney defects also are common, as well as vision and hearing problems. Individuals with FAS have difficulties with learning, attention, memory, and problem solving." "Fetal Alcohol Spectrum Disorders (FASD) is an umbrella term describing the range of effects that can occur in an individual whose mother drank alcohol during pregnancy. These effects may include physical, mental, behavioral, and/or learning disabilities with possible lifelong implications." FASD encompasses the term "fetal alcohol effects," which "has been popularly used to describe alcohol-exposed individuals whose condition does not meet the full criteria for an FAS diagnosis." National Organization on Fetal Alcohol Syndrome, *FAQs* <http://www.nofas.org/faqs.aspx?id=9> (accessed June 30, 2009).

[8] MCL 712A.19b(3)(i) provides:

> The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (i) Parental rights to 1 or more siblings of the child have been terminated due to serious and chronic neglect or physical or sexual abuse, and prior attempts to rehabilitate the parents have been unsuccessful.

10

clear and convincing evidence by presenting opinions and orders of the Sault Ste.

Marie Tribe of Chippewa Indians Tribal Court terminating respondent's parental

rights to JL's siblings. The court noted that termination in those cases was based

on sections of the tribal code "virtually identical" to MCL 712A.19b(3)(c)(*i*) and

(*ii*) and (g).[9] It further noted that those opinions "discussed the services that had

been provided and the apparent lack of any benefit gained by Respondent from

those services." Next, the trial court found insufficient evidence to conclude that

---

[9] MCL 712A.19(3) provides, in relevant part:

> The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:
>
> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.
>
> (*ii*) Other conditions exist that cause the child to come within the court's jurisdiction, the parent has received recommendations to rectify those conditions, the conditions have not been rectified by the parent after the parent has received notice and a hearing and has been given a reasonable opportunity to rectify the conditions, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.
>
> * * *
>
> (g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

11

termination was not in the best interests of the child. MCR 3.977(F). Finally, the court concluded that the requirements of MCR 3.980(D)[10] had been met. The court summarized its reasoning as follows:

> This finding is based on: 1) the previous services and lack of benefit from same which raises the likelihood of some form of serious physical injury; 2) the length of time the child has been residing outside the Respondent's home and the emotional damage that would result in requiring a reunification plan; 3) the testimony presented that Respondent's lack of benefit was not due to Respondent's lack of maturity, but rather lack of ability; and 4) Respondent's most recent conduct of operating a motor vehicle while impaired due to alcohol.[11]

Respondent appealed, and the Court of Appeals affirmed. A majority concluded that the trial court did not clearly err when it determined that (1) the statutory ground for termination in MCL 712A.19b(3)(i) had been established by clear and convincing evidence, (2) termination was not clearly contrary to JL's best interests, (3) efforts had been made to provide services designed to prevent the breakup of respondent's family, and (4) the DHS had proved beyond a

---

[10] MCR 3.980(D) contains language similar to that of 25 USC 1912(f) and provides:

> Termination of Parental Rights. In addition to the required findings under MCR 3.977, the parental rights of a parent of an Indian child must not be terminated unless there is also evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that parental rights should be terminated because continued custody of the child by the parent or Indian custodian will likely result in serious emotional or physical damage to the child.

[11] The trial court did not specifically address the ICWA's "active efforts" requirement, 25 USC 1912(d).

reasonable doubt that respondent's continued custody was likely to result in serious emotional or physical damage to JL, 25 USC 1912(f). The appeals panel unanimously agreed that the trial court properly denied respondent's request for a jury trial. *Lee*, *supra*, slip op at 5-10.

Judge Gleicher dissented from the majority's conclusions that the DHS had satisfied the "active efforts" requirement of the ICWA, 25 USC 1912(d), and that the record established beyond a reasonable doubt that respondent's continued custody was "likely to result in serious emotional or physical damage to the child," 25 USC 1912(f). *Lee*, *supra*, slip op at 4-11 (Gleicher, J., concurring in part and dissenting in part.)

We granted respondent's application for leave to appeal to consider the proper interpretation of 25 USC 1912(d) and (f) of the ICWA.[12]

## II. The Indian Child Welfare Act

Congress enacted the ICWA in 1978 in response to

rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian

---

[12] We directed the parties to address

(1) whether the term "active efforts" in 25 USC 1912(d) requires a showing that there have been recent rehabilitative efforts designed to prevent the breakup of that particular Indian family; and (2) whether the "beyond a reasonable doubt" standard of 25 USC 1912(f) requires contemporaneous evidence that the continued custody of the Indian child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child before parental rights may be terminated. [*In re Lee*, 482 Mich 1116, 1116-1117 (2008) (emphasis omitted).]

13

children from their families and tribes through adoption or foster care placement, usually in non-Indian homes. [*Mississippi Band of Choctaw Indians v Holyfield*, 490 US 30, 32; 109 S Ct 1597; 104 L Ed 2d 29 (1989).]

"Recognizing the special relationship between the United States and the Indian tribes and their members and the responsibility to Indian People," Congress found:

> (3) that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe;

> (4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and

> (5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families. [25 USC 1901.]

Accordingly, it enacted the ICWA to establish "minimum Federal standards for the removal of Indian children from their families . . . ." 25 USC 1902.

The ICWA sets forth requirements with which states must comply when an "Indian child," as defined in the act, 25 USC 1903(4), is involved in a "child custody proceeding," which includes a proceeding to terminate parental rights, 25 USC 1903(1)(ii). If state or federal law "provides a higher standard of protection to the rights of the parent or Indian custodian of an Indian child" than the ICWA, the court must apply that higher state or federal standard. 25 USC 1921.

14

25 USC 1912 provides, in part:

> (d) Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

> * * *

> (f) No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

III. The Adoption and Safe Families Act and MCL 712A.19b(3)(i)

The Adoption and Safe Families Act of 1997 (ASFA), PL 105-89, 111 Stat 2115, requires that states undertake "reasonable efforts" to "preserve and reunify families" as a condition of federal funding. 42 USC 671(a)(15)(B). The ASFA excuses proof of reasonable efforts to reunify when "the parental rights of the parent to a sibling have been terminated involuntarily[.]" 42 USC 671(a)(15)(D)(iii). MCL 712A.19a(2)(c) codifies both the "reasonable efforts" requirement and the exception to that requirement when a prior termination has taken place. Additionally, MCL 712A.19b(3)(i), which was the state law basis for the termination of respondent's parental rights here, makes involuntary termination of parental rights to a child's sibling a ground for termination.

Because the ICWA establishes "minimum Federal standards for the removal of Indian children from their families," 25 USC 1902, and nothing in the

15

ASFA indicates a congressional intent to supersede the ICWA, neither the ASFA nor its state law analogues relieve the DHS from the ICWA's "active efforts" requirement, 25 USC 1912(d), or from the burden of establishing beyond a reasonable doubt "that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child," 25 USC 1912(f).

## IV. Standard of Review

This Court reviews issues involving the application and interpretation of the ICWA de novo as questions of law. *In re Fried*, 266 Mich App 535, 538; 702 NW2d 192 (2005). Under 25 USC 1912(f), "[n]o termination of parental rights may be ordered . . . in the absence of a determination, supported by evidence beyond a reasonable doubt, . . . that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." Because Congress did not provide a heightened standard of proof in 25 USC 1912(d), as it did in 25 USC 1912(f), the default standard of proof for termination of parental rights cases, clear and convincing evidence, applies to the determination whether the DHS provided "active efforts . . . to prevent the breakup of the Indian family" under 25 USC 1912(d). *In re Roe*, 281 Mich App 88, 100-101; 764 NW2d 789 (2008).[13]

---

[13] Although our research disclosed no federal authority on this point, several of our sister states have employed similar reasoning. See, e.g., *In re Walter W*, 274 Neb 859, 864-865; 744 NW2d 55 (2008); *In re MS,* 624 NW2d 678

## V. "Active Efforts"

The ICWA requires the petitioner in a termination case to "satisfy the court that active efforts have been made to prevent the breakup of the Indian family . . . ." 25 USC 1912(d). Respondent argues that because the DHS failed to provide *current* active efforts, termination of her parental rights to JL violated the ICWA. We disagree.

### A. Court of Appeals

Respondent urges us to adopt Judge Gleicher's dissenting view in *Roe*[14] and *Lee* that both the plain and ordinary meaning of "active" and the purpose and object of the ICWA point to a temporal requirement: "In my view, Congress's use of the term "active efforts" signals its intent that petitioner clearly and convincingly demonstrate the provision of *current* rehabilitative efforts designed to reunite an Indian parent with the particular child that is the target of the termination proceedings." *Lee*, *supra*, slip op at 6 (Gleicher, J., concurring in part and dissenting in part) (emphasis in original). Judge Gleicher concluded that, in light of the purposes of the ICWA and its requirement that the "state prove beyond a

---

(ND, 2001)*; In re Michael G*, 63 Cal App 4th 700, 709-712; 74 Cal Rptr 2d 642 (1998).

[14] In *Roe*, the same Court of Appeals panel considered the proper interpretation of the "active efforts" requirement of 25 USC 1912(d). There, as here, Judges Markey and Whitbeck disagreed with Judge Gleicher about the meaning of "active efforts." In *Roe*, however, the Court of Appeals judgment vacated the trial court's order and remanded the case for trial court findings regarding the "active efforts" requirement. *Roe*, *supra* at 91.

reasonable doubt that 'the continued custody' of the Indian child by the parent 'is likely to result in serious emotional or physical damage to the child,'" "active efforts" includes a temporal component. *Id*., quoting 25 USC 1912(f) (emphasis omitted).

The Court of Appeals majority in this case relied on its more extensive opinion in *Roe*. There it acknowledged that "'active' may be 'characterized by current activity, participation or use,'" *Roe*, *supra* at 102, quoting *Random House Webster's College Dictionary* (1997), but agreed with "the majority of jurisdictions that have addressed this issue" that concurrent "active efforts" need not necessarily be shown in each proceeding, *Roe*, *supra* at 102. The majority concluded that, "[c]onstrued in context, [25 USC 1912(d)] only requires 'that timely and affirmative steps be taken . . . to avoid the breakup of Indian families whenever possible by providing services designed to remedy the problems which might lead to the severance of the parent-child relationship.'" *Id*. at 106 (citation omitted). Services provided in connection with a prior proceeding, or "'formal or informal efforts to remedy a parent's deficiencies before dependency proceedings begin'" may meet the "active efforts" requirement. *Id*., quoting *In re KD*, 155 P3d 634, 637 (Colo App, 2007). The Court of Appeals majority thus "decline[d] to employ a definition of 'active' that stresses a temporal requirement." *Roe*, *supra* at 106. Instead, it defined "active efforts" as the opposite of "passive efforts." *Id*. at 106-107. Finally, it "note[d] that the majority of jurisdictions interpret 'active efforts' as imposing a higher burden than various states' 'reasonable efforts'

18

requirement, and that numerous courts have required that the service provider 'provide *culturally relevant* remedial and rehabilitative services to prevent the breakup of the family.'" *Id*. at 108 (citations omitted).

## B. Analysis

We agree with the *Roe* majority that the crux of the "active efforts" requirement is undertaking affirmative, as opposed to passive, efforts:

> "Passive efforts are where a plan is drawn up and the client must develop his or her own resources toward bringing it to fruition. Active efforts, the intent of the drafters of the Act, is where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own. For instance, rather than requiring that a client find a job, acquire new housing, and terminate a relationship with what is perceived to be a boyfriend who is a bad influence, the Indian Child Welfare Act would require that the caseworker help the client develop job and parenting skills necessary to retain custody of her child." [*Id*. at 107, quoting *AA v Alaska Dep't of Family & Youth Services*, 982 P2d 256, 261 (Alas, 1999).]

We also agree that "active efforts" require more than the "reasonable efforts" required under state law. *Roe*, *supra* at 108, citing *In re Nicole B*, 175 Md App 450, 471; 927 A2d 1194 (2007), *Winston J v Alaska Dep't of Health & Social Services*, 134 P3d 343, 347 n 18 (Alas, 2006), *MW v Alaska Dep't of Health & Social Services*, 20 P3d 1141, 1146 n 18 (Alas, 2001), *In re Walter W*, 274 Neb 859, 865; 744 NW2d 55 (2008), and *In re JS*, 177 P3d 590, 593 (Okla Civ App, 2008).

The version of the DHS's Childrens Foster Care Manual in effect at the time of the termination trial provides an example of this distinction:

19

ICWA requires that anytime the DHS is involved with Indian children and their families, culturally Active Efforts must be provided. "Reasonable Efforts" as defined in other parts of current DHS policy are not sufficient.

\* \* \*

Active Efforts require that the caseworker take a more pro-active approach with clients and actively support the client in complying with the service plan rather than requiring the service plan be performed by the client alone. Following are examples of appropriate Active Efforts that could serve as a starting point of reference; in collaboration with the child's Tribe:

a. Taking clients to initial appointments and assisting with the intake process OR

b. Transporting client, arranging transportation and child care appointments OR

c. If the client is isolated from other family members who may be in a position to provide positive support, the worker is to provide help to the families to begin conversations with those family members.

d. Assisting with completing applications.

e. Providing phone availability.

\* \* \*

DHS is to make culturally active and appropriate efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family before any consideration for removal can be made. DHS policy requires Active Efforts prior to court involvement. Active Efforts must be **documented to the court and Tribe**. [Childrens Foster Care Manual, Indian Child Welfare (June 1, 2007), pp 5-6.][15]

---

[15] Although included in respondent's appendix, this version of the manual is no longer in effect and is not available online. The parties also did not provide the version of the manual in effect before June 1, 2007. The current version of the

In addition, the Bureau of Indian Affairs' guidelines explain that

> [t]hese [active] efforts shall take into account the prevailing social and cultural conditions and way of life of the Indian child's tribe.

---

DHS's Native American Affairs manual, Native American Affairs Glossary (October 1, 2008), pp 1-2, available at <http://www.mfia.state.mi.us/olmweb/ex/nag/glossary.pdf> (accessed June 30, 2009), provides a similar explanation:

> By definition, active efforts are more intensive than "reasonable efforts" and require the worker to thoroughly assist the family in accessing and participating in necessary services that are culturally appropriate and remedial and rehabilitative in nature.
>
> **Example**: Reasonable efforts might be the worker making a referral for services and attempts to engage the family in services, but active efforts might be the worker consulting with the tribe regarding case planning, making a referral to services, attempts to engage the family in services and providing transportation to the services.
>
> * * *
>
> Examples of active efforts include (but are not limited to):
>
> •Making appointments for the client with particular providers.
> •Providing transportation to and from such appointments.
> •Closely monitoring client(s)' participation in such services.
> •Continuing with ongoing efforts to secure a placement with
>
> the ICWA Placement Preferences [25 USC 1912(d)].

See also the DHS's Childrens Protective Services Manual, Supportive Services, CFP 714-2 (May 1, 2009), p 1, available at <http://www.mfia.state.mi.us/olmweb/ex/cfp/714-2.pdf> (accessed June 30, 2009) ("Reasonable efforts to prevent placement must be attempted in all situations in which the child is not at imminent risk of harm without removal from home. **Note**: The Indian Child Welfare Act requires active efforts be provided to American Indian children and their families. Reasonable efforts are not sufficient.").

They shall also involve and use the available resources of the extended family, the tribe, Indian social service agencies and individual Indian care givers. [Bureau of Indian Affairs, Guidelines for State Courts; Indian Child Custody Proceedings, D.2, 44 Fed Reg 67584, 67592 (November 26, 1979), also available at <http://www.nicwa.org/administrative_regulations/icwa_guidelines.pdf> (accessed June 30, 2009).][16]

In this case, however, the fundamental disagreement is not about the nature of the required services, but about the timing of those services. Indeed, respondent acknowledges that the DHS and the tribe provided active efforts in the past, but argues that 25 USC 1912(d) requires *current* active efforts, which the DHS failed to provide because it did not offer services in connection with the termination of her parental rights to JL. We decline to read the word "current" into 25 USC 1912(d). This statutory language does not impose a strict temporal component for the "active efforts" requirement.

This is not to say that active efforts provided in the distant past are sufficient. Although we decline to establish an arbitrary threshold beyond which services will not satisfy the requirements of 25 USC 1912, we direct trial courts to carefully assess the timing of the services provided to the parent. Services

---

[16] The most recent version of the DHS's Native American Affairs Manual, Indian Child Welfare Case Management, NAA 205 (March 1, 2009), p 1, available at <http://www.mfia.state.mi.us/olmweb/ex/NAA/205.pdf> (accessed June 30, 2009), states that the "worker must collaborate with a child's tribe immediately" and that the child's tribe will define active efforts for the department." Although this version of the Native American Affairs Manual was not yet in effect during the proceedings in this case, leaving it to the child's tribe to define "active efforts" is consistent with the ICWA's purpose of preserving Indian families and preventing unwarranted removal and termination. See 25 USC 1901.

provided too long ago to be relevant to a parent's current circumstances do not establish by clear and convincing evidence that active efforts have been made, as required by 25 USC 1912(d), and raise a reasonable doubt under 25 USC 1912(f) about whether continued custody is "likely to result in serious emotional or physical damage to the child."[17]   The timing of the services must be judged by reference to the grounds for seeking termination and their relevance to the parent's current situation.

Similarly, we decline to hold that active efforts must always have been provided in relation to the child who is the subject of the current termination proceeding.   Again, the question is whether the efforts made and the services provided in connection with the parent's other children are relevant to the parent's current situation and abilities so that they permit a current assessment of parental fitness as it pertains to the child who is the subject of the current proceeding.   The

---

[17] For example, in *CJ v Alaska Dep't of Health & Social Services*, 18 P3d 1214 (Alas, 2001), the father was unable, and perhaps unwilling, to care for his children at the time they were removed from their mother in 1998.  He maintained only sporadic contact with them while they were in foster care.  *Id*. at 1216.  By the time termination was sought in 1999, however, the father's circumstances had changed.  He presented unrebutted evidence that he wanted to care for his children and was able to do so.  He testified that he had quit a job that required him to travel, was relocating, and was caring for his older child.  The social services department presented virtually no evidence regarding the father's present circumstances.  *Id*. at 1219.  The Alaska Supreme Court concluded:

> ICWA requires that a court be able to determine beyond a reasonable doubt that placement of the children with the parent is likely to result in serious damage.  The evidence in this case leaves so much uncertainty about [the father's] present circumstances that such a finding cannot be sustained.  [*Id*. (citation omitted).]

23

evidence must satisfy the court "beyond a reasonable doubt" that the parent's continued custody of that child "is likely to result in serious emotional or physical damage to the child," as required by 25 USC 1912(f).

Some courts, including the Court of Appeals in *Roe*, have adopted a "futility test" to explain that the "active efforts" requirement may be met in certain cases without the provision of additional services. In *KD*, for example, the child had been removed from his parents in 2001 and 2004. Both times, the parents completed their treatment plans, and the child was returned to them. The termination petition at issue was filed after the respondent father was arrested in 2005 and the mother was incarcerated. *KD*, *supra* at 636. In affirming the trial court's decision to terminate the father's parental rights, the appellate court rejected his argument that the active efforts must be part of a treatment plan offered as part of the current "dependency proceedings." *Id*. at 637. It held that the "active efforts" requirement may be met by "formal or informal efforts to remedy a parent's deficiencies before the dependency proceedings begin":

> In other words, the court may terminate parental rights without offering additional services when a social services department has expended substantial, but unsuccessful, efforts over several years to prevent the breakup of the family, and there is no reason to believe additional treatment would prevent the termination of parental rights. [*Id*.]

The court noted that extensive services had been provided to the father during the two prior dependency cases and concluded that the record supported the trial court's findings that it would have been futile to offer additional services. *Id*.

24

Citing *KD* and other sister-state authority, the Court of Appeals majority in *Roe* adopted a futility test. *Roe*, *supra* at 103-106.

We decline to adopt a futility test. In *KD*, the court concluded that additional services were not required because it saw no indication that additional services would prevent the need for termination. The ICWA obviously does not require the provision of *endless* active efforts, so there comes a time when the DHS or the tribe may justifiably pursue termination without providing additional services. A futility test does not capture this concept. In addition, we share dissenting Judge Gleicher's concern that, under a such a test, "the circuit court may altogether avoid applying [25 USC 1912(d)] by simply deciding that additional services would be 'futile.'" *Roe*, *supra* at 109 (Gleicher, J., concurring in part and dissenting in part).[18]

We further note that the DHS's apparent policy of providing no services when a petition for termination of parental rights is based on a prior termination will not withstand the heightened standard of the ICWA.[19] When the proceedings

---

[18] We reject Justice Weaver's contention that we need not decide whether to adopt a futility test. In this case, we address respondent's argument that the Court of Appeals erred in interpreting and applying the ICWA. In concluding that the "active efforts" requirement had been met, the Court of Appeals majority stated: "Because of the intractable nature of [respondent's] inability to learn appropriate parenting techniques, any additional efforts to rehabilitate [respondent] would have been largely futile." *Lee*, *supra*, slip op at 9.

[19] Frazier testified that she did not provide services to respondent in connection with this latest referral pertaining to JL because the referral was based on the termination of respondent's parental rights to her other three children. She testified that, under those circumstances, the state does not provide services.

25

involve an "Indian child" within the meaning of the ICWA, the DHS or the tribe must, even if services have been provided to the parent in the past, conduct a thorough and contemporaneous review of those services and the parent's progress or lack thereof in response to those services. Only if active efforts have been provided to prevent the breakup of the Indian family, and it does not appear that the provision of additional services is likely to prevent the need for termination, may the DHS or the tribe pursue termination without providing additional services.

## C. Application

Although the trial court did not use the words "active efforts," it took into account the services that were provided to respondent. It noted, for example, that respondent had attended parenting classes and that "one of the workers . . . even provided latches for the doors to prevent the children from getting out into the street and playing unsupervised." The court also stated that the caseworkers' testimony concerning respondent's inability to benefit from services "was supported by specific examples of Respondent being unable to apply principles she was taught during those services." The evidence clearly and convincingly establishes that the DHS and the tribe made active efforts to provide services designed to prevent the breakup of respondent's family. Indeed, the evidence shows that services designed to preserve respondent's family were provided over a six-year period from JL's birth in 1999 through 2005, before the termination of her parental rights to SD and JD. Caseworkers Frazier, Clark, and Thompson and

26

caseworker supervisor VanLuven testified in similar fashion about respondent's failure to improve her parenting skills.

Respondent received services from several different programs, many of which were tailored to her young age and particular needs. Various caseworkers who spent time in her home tried to teach her to become an adequate parent. Frazier testified that the wraparound program normally provides services for 6 to 12 months. Respondent, however, received wraparound services for three years, from 1999 to 2002, when respondent moved to a reservation and the tribe took jurisdiction. Frazier testified that "different methods" were used "in order to try to teach [respondent] . . . because of her age and . . . her development." Frazier said that "there was [sic] a lot of different methods used to . . . adjust services in order to make them fit for her. But they just still were not successful." Frazier was at respondent's house every week to teach her parenting skills, but respondent did not seem to learn. In one incident, respondent screamed and cried because JL, who was sitting in a high chair, would not eat the solid food respondent had put in front of him. Respondent failed to understand that JL was too young to drink homogenized milk, let alone eat solid food. Frazier was at respondent's home every week teaching her "those kinds of things." "And then we'd come back the next week and the house would be filthy. . . . It just never, it never seemed to take."

Clark began working with respondent in 2002. Respondent received services under the wraparound program in an attempt to prevent the removal of

SD, who was a few months old at the time, from respondent's home. After reports that respondent's children were found in the street, Clark went to respondent's house and put latches on the door so the children could not wander away. Clark also worked with respondent on budgeting, helped her apply for social security benefits, and arranged for someone to manage her finances once she obtained those benefits. When Clark closed respondent's case in 2005, she felt that she had provided all the services she could "without staying there 24/7," but respondent made no significant improvement. Clark testified that she provided every service she could think of and did not know what else could have been done.

Clark believed respondent's problems with parenting and her failure to benefit from services stemmed from a lack of ability, rather than from a lack of maturity. Clark testified that respondent loved her children very much and that, if it had been within her ability, she would have put herself in a position to care for her children, but her impulsiveness caused difficulty. Although Clark acknowledged that she had not provided services to respondent in connection with the case involving JL, she said that she had seen and worked with respondent enough to understand her parenting ability. On the basis of her experience, she did not believe that respondent could effectively care for JL.

Thompson similarly testified that her job was to offer services so that respondent could show that she could be a good parent, but respondent had failed to do so. Despite the services and support respondent received, Thompson testified that respondent's parenting and personal management skills did not

improve significantly while she worked with respondent. Given her past experiences with respondent, Thompson did not believe that respondent could appropriately care for a child.

Testifying as an Indian expert under 25 USC 1912(f), VanLuven was satisfied that active and reasonable efforts had been provided to prevent the termination of respondent's parental rights and that respondent's custody of JL would result in serious emotional or physical damage to JL. She testified that she believed the tribe had offered respondent every possible service. While she had never met respondent or been in her home, respondent's past behavior, including numerous instances of placing her children in unsafe situations and failing to supervise them appropriately, led to VanLuven's assessment that respondent was a "minimally adequate parent," but not on a consistent basis.

Although they were provided in connection with prior termination proceedings, the services offered to respondent were extensive, relatively recent, and tailored to meet her specific needs. Over several years, caseworkers came to respondent's home. They tried to teach her parenting and financial skills, without success. The evidence demonstrates that these efforts are relevant to the respondent's current situation and abilities. The caseworkers unsuccessfully attempted to address both respondent's poor decision-making and the unsafe conditions her decisions created. As further explained below, respondent's own testimony showed that she continued to make the same poor choices that she made

29

when she was receiving services. The ICWA's "active efforts" requirement has been met.

VI. The "Beyond a Reasonable Doubt" Standard of 25 USC 1912(f)

Relying on Judge Gleicher's dissent, respondent next argues that the Court of Appeals majority and the trial court improperly applied a presumption of respondent's unfitness based on her past conduct. She argues that conclusions based on such a presumption fail to meet the heightened "beyond a reasonable doubt" standard of 25 USC 1912(f). We agree with Judge Gleicher that termination based on "a presumption of unfitness predicated solely on past conduct" would be inconsistent with the "beyond a reasonable doubt" standard of the ICWA. *Lee*, *supra*, slip op at 8-9 (Gleicher, J., concurring in part and dissenting in part). We also agree that invocation of the doctrine of anticipatory neglect to terminate parental rights solely on the basis of past behavior would be inconsistent with that standard.[20] Here, however, the evidence concerning respondent's past conduct established that she was an unfit parent in the past, and

---

[20] Judge Gleicher took issue with the Court of Appeals majority's invocation of "the 'well-established doctrine of anticipatory neglect'" in affirming the trial court's decision to terminate respondent's parental rights. *Lee*, *supra*, slip op at 9 (Gleicher, J., concurring in part and dissenting in part). The Court of Appeals majority stated that, under the doctrine, "how a parent treats one child is probative, though not determinative, of how that parent will treat another, and past behavior is a strong indicator of future performance," *id*. at 9 (majority opinion) (citation omitted), but Judge Gleicher believed that "respondent's past behavior did qualify as determinative," *id*. at 9 (Gleicher, J., concurring in part and dissenting in part) (emphasis omitted).

the current evidence revealed that she continued to make choices that demonstrated a lack of maturity and ability to care for a child.

Respondent admitted that she had been twice arrested and convicted of operating a motor vehicle while impaired, once in 2005 and again in 2006. She had also been convicted of aggravated assault in connection with her involvement in a bar fight in 2005. Matheny testified that respondent had been sober since he began working with her, and he considered his counseling with her a success. He also testified that respondent's problem was not habitual drunkenness, but drinking bouts "a couple, three times a year." Matheny treated her only one hour weekly for eight months. He had never met JL, nor had he been in respondent's home. Matheny testified that—*under the limited circumstances described by respondent's counsel*—at the home of JL's grandmother, in a public place, for a short number of hours, or for one day, or for an afternoon a week, respondent did not pose a risk of harm to JL. Nothing in the testimony of respondent or Matheny suggested that the evidence of unfitness—on which the caseworkers and Indian expert VanLuven based their opinion that respondent's custody of JL would result in serious emotional or physical damage to JL—was outdated or no longer relevant.

Indeed, respondent's own testimony established that she continued to make poor choices. She supported the caseworkers' assessment that she was unfit to parent JL. Respondent acknowledged that her only income was social security disability benefits because she had been diagnosed with fetal alcohol syndrome.

31

She did not believe she suffered from that disorder. She also believed that she was able to work, even though she had not worked or sought work in about four years. She lived with and depended financially on Michael Plank. Respondent acknowledged that allegations of Michael Plank's violence against his former partner resulted in an assault conviction. She also admitted that she left tribal housing because of an impending eviction for alleged marijuana use in her home. Michael Plank had admitted smoking marijuana in connection with that allegation.

Moreover, the DHS and the tribe explored alternatives to termination.[21] Thompson testified that the agency attempted to place JL in a guardianship or long-term care with a relative, Lois Plank. The tribal court released JL from its jurisdiction in 2002 upon agreement that JL's father, Tony Plank, would be granted full custody. Tony Plank was subsequently incarcerated. Thompson testified that she was afraid to make a similar mistake in the future by placing JL with Lois Plank and putting respondent in a position to become the child's sole and legal custodian. Thompson also testified that an earlier guardianship established with the paternal grandfather of SD and JD was terminated after only two months at the guardian's request. The guardian had allowed respondent and Justin DuFresne visitation, but they did not follow the rules. Respondent took the children to Indiana without permission, for example. After the guardianship was

---

[21] During the parties' arguments, JL's guardian ad litem argued against termination of respondent's parental rights but did not advocate that respondent have full-time physical custody. Instead, he encouraged the court to "think outside the box" and consider alternatives such as long-term placements with relatives.

terminated, the tribe petitioned to terminate respondent's parental rights to SD and JD. Thompson explained, "We had just gone into . . . another case where the children were out in the road a year later, so conditions hadn't changed. So it was time for termination if there was no other way."

In sum, the caseworkers' testimony established beyond a reasonable doubt that respondent failed to make progress despite the extensive services provided to her in the recent past. She continued to pose a risk of harm to her children. Respondent's testimony did not suggest that she had gained the capacity to take on the responsibilities of a full-time parent. On the contrary, her testimony indicated that she continued to make poor choices that did not suggest that she had the ability to provide a safe and stable home for a child. And although Matheny's testimony about respondent was positive, he had never met JL or been in respondent's home. Eight months of substance abuse counseling, even if beneficial, had not rendered respondent an adequate parent. Finally, the DHS demonstrated that respondent's continued legal custody of JL posed a risk, even if she were not the full-time physical custodian, because it left open the possibility that respondent might seek full-time custody. The lower courts did not err by concluding that the evidence established beyond a reasonable doubt that respondent's continued custody of JL was likely to result in serious emotional or physical damage to him. Respondent's continued custody would further subject JL to the consequences of respondent's poor choices, including her decision to live

33

with and financially depend on a man who had been convicted of assault, and would put JL at risk of abuse and neglect.[22]

## VII. Conclusion

We conclude that the evidence demonstrated beyond a reasonable doubt that respondent's continued custody of JL would be "likely to result in serious emotional or physical damage to the child." 25 USC 1912(f). We also conclude that the extensive services provided to respondent before the DHS filed this

---

[22] We cannot accept Justice Cavanagh's suggestion that our analysis is inconsistent with this Court's decision in *In re Rood*, 483 Mich 73; 763 NW2d 587 (2009). In *Rood,* we affirmed the Court of Appeals decision reversing the trial court's termination of parental rights and directing the trial court to afford the respondent an opportunity to participate in the proceedings. We were skeptical about the trial court's determination that there was a "reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." MCL 712A.19b(3)(j). In light of the testimony of the respondent and his girlfriend that the respondent "successfully cared for a young child . . . on a daily basis," we concluded that the state's failure to assess the respondent's household as an appropriate placement for the child "deprived the court of objective information on a disputed issue crucial to the outcome." *Id*. at 117.

In contrast to *Rood,* in which the state did not even consider placing the child with the respondent, the caseworkers here provided extensive services to respondent over several years in an effort to prevent removal and termination. And in *Rood*, the evidence suggested that the respondent had successfully cared for a child on a daily basis, while the evidence in this case showed that respondent persisted in making the same poor choices that have historically prevented her from being a safe and adequate parent on a consistent basis.

We also reject Justice Cavanagh's suggestion that consideration of guideline D.3(c) of the Bureau of Indian Affairs guidelines, 44 Fed Reg 67584, 67593 (November 26, 1979), would yield the conclusion that the conditions that existed in respondent's home in the past are not "sufficiently 'serious' to satisfy 25 USC 1912(f)." *Post* at 9 n 9. Here, the evidence did not merely establish "'poverty, crowded or inadequate housing, alcohol abuse, or non-conforming social behavior,'" see *post* at 9 n 9, but identified specific harms to respondent's children, including respondent's failure to appropriately supervise them.

termination petition satisfied the "active efforts" requirement of the ICWA.  25 USC 1912(d).  Accordingly, we affirm the judgment of the Court of Appeals upholding the trial court's order terminating respondent's parental rights.

<div style="margin-left: 40%;">
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway
</div>

S T A T E  O F  M I C H I G A N

SUPREME COURT

In re JL, Minor.

_____

DEPARTMENT OF HUMAN SERVICES,

        Petitioner-Appellee,

v                                                   No. 137653

CHERYL LYNN LEE,

        Respondent-Appellant,

and

SAULT STE. MARIE TRIBE OF
CHIPPEWA INDIANS,

        Intervening Respondent-
        Appellee.

_____

WEAVER, J. (*concurring*).

       I concur in the majority opinion except for its discussion in part V(B) concerning the adoption of a "futility test." I do not believe it is necessary for the majority to decide whether this Court should adopt a "futility test" in this case, given that such a determination is not necessary for resolving the issues in front of us at this time.

                                                    Elizabeth A. Weaver

STATE OF MICHIGAN

SUPREME COURT

In re JL, Minor.

_____

DEPARTMENT OF HUMAN SERVICES,

       Petitioner-Appellee,

v                                                                          No. 137653

CHERYL LYNN LEE,

       Respondent-Appellant,

and

SAULT STE. MARIE TRIBE OF
CHIPPEWA INDIANS,

       Intervening Respondent-
       Appellee.

_____

CAVANAGH, J. (*concurring in part and dissenting in part*).

I concur in full with parts I through IV and parts V(A) and (B) of the majority opinion. I write separately to further clarify my view regarding the proper interpretation of 25 USC 1912(d) and to dissent from the majority's application of that statute in this case in part V(C). I further dissent from the majority's application of 25 USC 1912(f) in part VI. I would reverse the judgment of the Court of Appeals, vacate the order terminating respondent's parental rights to JL, and remand this case to the trial court for further proceedings.

## I. "ACTIVE EFFORTS" AND 25 USC 1912(d)

Under 25 USC 1912(d), the party seeking to terminate parental rights must satisfy the court, by clear and convincing evidence, that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." This Court asked the parties to address whether, in order to satisfy the statute, "active efforts" must be concurrent with the instant proceeding and whether the efforts must be targeted at the child who is the subject of the proceeding.[1]

I fully concur with the majority's holding that the relevant inquiry for both of these issues is "whether the efforts made and the services provided . . . are relevant to the parent's current situation and abilities so that they permit a current assessment of parental fitness as it pertains to the child who is the subject of the current proceeding." *Ante* at 23. I further agree that, although the text of 25 USC 1912(d) does not strictly require that efforts be made concurrently with the proceedings or be directed at the child who is the subject of the proceeding, the timing and the subject of the efforts are still relevant aspects in determining whether the requirements of 25 USC 1912(d) and (f) are met. *Ante* at 22-23. As stated by the majority, "[s]ervices provided too long ago to be relevant to a parent's current circumstances do not establish by clear and convincing evidence that 'active efforts' have been made . . . ." *Ante* at 22-23. Similarly, services presented in connection with one child will not always be relevant in determining

---

[1] There was no dispute that the efforts must, at a minimum, be targeted at the parent who is the subject of the proceeding.

a parent's abilities to care for a different child. I also concur with the majority's explanation of the qualitative requirements associated with providing active, as opposed to passive, efforts and its rejection of a "futility exception" to the "active efforts" requirement. *Ante* at 19-22, 25.

Although I agree with the majority's articulation of what 25 USC 1912(d) requires, I dissent from its application of 25 USC 1912(d) here because I would hold that, in order to meet this standard, the party seeking termination must present evidence of the parent's current circumstances and ability to parent the child who is the subject of the proceeding.[2] I would also hold that the party must assess and provide evidence of the relevancy of past efforts to the family's current circumstances and needs. Absent such evidence, I do not see how the party seeking termination could clearly and convincingly show that, as required by the majority, past efforts to prevent the breakup of the family "are relevant to the parent's current situation and abilities" and are sufficient to "permit a current assessment of parental fitness as it pertains to the child who is the subject of the current proceeding." *Ante* at 23.

In this case, the party seeking termination, the Department of Human Services (DHS), did not present evidence regarding respondent's current circumstances and did not assess the relevancy of its past efforts to respondent's current circumstances. As summarized by the majority opinion, the DHS did

---

[2] This would be true even if the parent presents no evidence that the parent's circumstances or parenting abilities have changed. It is the burden of the party seeking termination to show that past efforts are relevant to the parent's current situation.

present ample evidence that there had been extensive past efforts by the DHS, and the tribe, that were designed to prevent the breakup of the family and evidence that those efforts had been largely unsuccessful. *Ante* at 26-30. The DHS did not, however, present evidence regarding whether these past efforts were relevant to respondent's and JL's current circumstances. The caseworkers who testified at trial admitted that, for a year and a half or longer before the termination proceeding, they had not observed or evaluated respondent, respondent's home situation, respondent's parenting ability, or respondent's interactions with JL.[3] Given that the DHS did not evaluate respondent's current circumstances or current ability to parent JL, the agency also could not have evaluated whether the past

---

[3] Regina Frazier, the DHS caseworker, testified that the DHS had not provided to respondent services targeting JL since 2004 and had not provided services regarding any of her children for a year and a half before the termination hearing. Frazier agreed that there had been "no services to [respondent] regarding reunification of her child, no active efforts to reunite this family, particularly with" JL in that period and stated that she did not know how respondent would react to services at this time.

Penny Clark, the Anishinabek Community Family Services caseworker, testified that she had provided services to respondent that were targeted at managing a household with two young children. She testified that she had not provided respondent services since 2005, had never been to respondent's current home, and would not be able determine respondent's current ability to parent.

Jill Thompson, a Binogii Placement Agency caseworker, testified that she had not provided services to respondent or visited respondent's home for more than two years before the termination hearing.

Thompson and Clark's supervisor, Melissa VanLuven, testified that the tribe had not provided respondent services since 2005 and had not provided her services specific to JL since 2002.

efforts of the DHS and the tribe were relevant to her "current" circumstances and abilities, as the majority purports to require.[4]

Accordingly, in light of the DHS's failure to assess the relevancy of past services to respondent's current circumstances or ability to parent JL, I dissent from the majority's result. I would hold that it is not possible to determine whether the agencies' past efforts "are relevant to the parent's current situation and abilities" such that they are sufficient to "permit a current assessment of parental fitness" using the evidence presented by the DHS in this case.[5]

## II. "BEYOND A REASONABLE DOUBT" AND 25 USC 1912(f)

A parent's rights may not be terminated "in the absence of a determination, supported by evidence beyond a reasonable doubt, . . . that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child." 25 USC 1912(f). The burden of proof is on the party seeking termination. MCR 3.977(A)(1) and (3). I respectfully dissent from the majority's determination that the DHS met this very high standard here.

---

[4] Instead, according to the testimony of one caseworker, the agency moved directly to termination proceedings because, as a matter of policy, the DHS does not provide services when the grounds for termination under state law are "automatic." I agree with the majority's holding that this policy is inconsistent with the Indian Child Welfare Act. See *ante* at 25-26.

[5] It is conceivable that, if the DHS were to evaluate respondent's current circumstances and present evidence to the trial court that its past efforts were relevant to respondent's and JL's current circumstances, the trial court could validly determine that the requirements of 25 USC 1912(d) were met without the DHS providing any further services. But absent that evaluation and the resulting evidence, regardless of how extensive the agency's past efforts were, I cannot agree that the DHS has shown that active efforts were made to prevent the breakup of the family and that those efforts were unsuccessful.

I would hold that contemporaneous evidence must be presented in order for a court to determine *beyond a reasonable doubt* that "serious emotional or physical damage to the child" is likely to result, as required by 25 USC 1912(f).[6] This holding is supported by the standards set forth in that statute and the Bureau of Indian Affairs' guidelines for state courts.

Under 25 USC 1912(f), there are stringent requirements that must be met before a parent's rights may be terminated under the Indian Child Welfare Act (ICWA). To begin with, it adopted the "beyond a reasonable doubt" standard. It is well established that the "beyond a reasonable doubt" standard is the highest that may be imposed by a legislature. As stated by the United States Supreme Court, "Congress requires 'evidence beyond a reasonable doubt' for termination of Indian parental rights, reasoning that 'the removal of a child from the parents is a penalty as great [as], if not greater, than a criminal penalty . . . .'" *Santosky v Kramer*, 455 US 745, 769; 102 S Ct 1388; 71 L Ed 2d 599 (1982), quoting HR Rep No 95-1386, at 22 (1978). This is significant because it demonstrates that the "stringency of the 'beyond a reasonable doubt' standard bespeaks the 'weight and gravity' of the private interest affected, society's interest in avoiding erroneous convictions, and a judgment that those interests together require that 'society impos[e] almost the entire risk of error upon itself.'" *Santosky*, 455 US at 755

---

[6] This is consistent with the majority's statement that "termination based on a presumption of unfitness predicated solely on past conduct would be inconsistent with the 'beyond a reasonable doubt' standard . . . ." *Ante* at 30 (quotation marks omitted). I also concur with the majority's holding that the anticipatory-neglect doctrine cannot serve as the sole basis for termination under 25 USC 1912(f). This construction of the statute is consistent with the purposes of the Indian Child Welfare Act outlined in part II of the majority opinion. *Ante* at 13-14.

(internal citations omitted). Congress deliberately used the "beyond a reasonable doubt" standard in 25 USC 1912(f) as a reflection of the weight and gravity of the interest that is at stake. To hold that the standard could be met absent contemporaneous evidence would afford inadequate respect to this determination.

Further, the statute sets the high standard that the party seeking termination must present evidence that a parent's continued custody of the child is "likely to result in serious emotional or physical damage to the child." I would hold that under 25 USC 1912(f), consistently with the purposes of ICWA and the "beyond a reasonable doubt" standard, a determination that *serious* emotional or physical damage to the child is *likely* to result requires current, specific evidence. This evidence should be relevant to the child who is the subject of the proceeding and the circumstances that will cause the specific damage that is likely to result.[7] This is consistent with the Bureau of Indian Affairs' guideline that states:

> [T]he evidence must show *the existence of particular conditions in the home* that are likely to result in serious emotional or physical damage *to the particular child who is the subject of the proceeding*. The evidence must show the causal relationship between the conditions that exist and the damage that is likely to result. [Bureau of Indian Affairs, Guidelines for State Courts; Indian Child Custody Proceedings, D.3(c), 44 Fed Reg 67584, 67593 (November, 26, 1979) (BIA Guideline D.3[c]) (emphasis added).]

This guideline is not binding on this Court, but I find it instructive here. In order to show the existence of *particular* conditions in the home, and a causal

---

[7] Similarly, this Court recently expressed skepticism that, under MCL 712A.19b(3)(j), the DHS could present even clear and convincing evidence that there was a "reasonable likelihood" that a child would "be harmed" if returned to a parent's home when "no one had evaluated [the parent] and his lifestyle." *In re Rood*, 483 Mich 73, 117-118; 763 NW2d 587 (2009).

relationship between those conditions and a serious harm that is likely to result, the party seeking termination must present contemporaneous evidence of the current conditions of the parent's home. Therefore, even if the "active efforts" requirements of 25 USC 1912(d) could be met without the DHS's presenting a current assessment of respondent's circumstances and ability to parent and the relevancy of past service efforts to those circumstances, I do not think that the standard in 25 USC 1912(f) requiring a determination beyond a reasonable doubt of the likelihood of serious emotional or physical damage could be met absent such contemporaneous evidence.

Despite holding that the "beyond a reasonable doubt" standard cannot be met with evidence only of a parent's past conduct, the majority opinion nonetheless concludes that there was sufficient contemporaneous evidence presented in this case to support terminating respondent's parental rights. The majority bases this conclusion on evidence of respondent's past conduct and current evidence that "revealed that [respondent] continued to make choices that demonstrated a lack of maturity and ability to care for a child."[8] *Ante* at 30-31. I

---

[8] The majority relies heavily on the "current evidence" of respondent's 2005 and 2006 convictions for operating a motor vehicle while impaired, her 2005 conviction of aggravated assault for a bar fight, and respondent's boyfriend's past conviction of domestic assault. Strikingly, by comparison, in *In re Rood*, Justice Corrigan's lead opinion found it significant that none of the parent's past convictions involved violence against children. The parent had testified that he had reformed and was staying out of trouble, and the DHS had not evaluated the parent's current home situation, so "[*n*]*o one knew* whether [the parent] was likely to persist in criminal behavior because no one had evaluated him and his lifestyle." *In re Rood*, 483 Mich at 117-118 (emphasis in original). Similarly, in this case, respondent's and her significant other's convictions do not involve violence against children, respondent and her addictions counselor testified that she had made progress since those convictions, and the DHS had not evaluated respondent and her lifestyle since those convictions. Although the factual circumstances of

8

do not think that contemporaneous evidence demonstrating "a lack of maturity" is sufficient to meet the "beyond a reasonable doubt" standard, particularly when considered in light of the stringent evidentiary requirements suggested by the BIA Guideline D.3(c).[9] The DHS could not have presented evidence of particular conditions in respondent's home when it did not evaluate respondent's current home, the risks it would pose to an 8- to 10-year-old child, or respondent and JL's relationship. The DHS certainly could not have presented evidence showing a causal link between specific conditions in respondent's home and a likelihood of JL suffering any specific serious emotional or physical damage. Considering the dearth of contemporaneous evidence related to respondent's and JL's current circumstances, and the stringent standards of 25 USC 1912(f), I respectfully dissent from the majority's determination that the "beyond a reasonable doubt" standard of 25 USC 1912(f) was satisfied by the evidence presented in this case.

---

the cases differ, I find this Court's skepticism that a parent's past convictions can provide *clear and convincing* evidence of a reasonable likelihood of *harm* to the child inconsistent with its finding in this case that similar convictions significantly contribute to establishing *beyond a reasonable doubt* that *serious harm* to the child is likely to result.

[9] BIA Guideline D.3(c) also suggests that even if the types of harm to which JL may have been subjected in respondent's home two years ago still existed in respondent's current home, those harms might not be sufficiently "serious" to satisfy 25 USC 1912(f). BIA Guideline D.3(c) states: "Evidence that only shows the existence of community or family poverty, crowded or inadequate housing, alcohol abuse, or non-conforming social behavior does not constitute clear and convincing evidence that continued custody is likely to result in serious emotional or physical damage to the child."

I would urge lower courts to consider BIA Guideline D.3(c) when determining under 25 USC 1912(f) whether "serious" damage to the child is likely to occur.

III. CONCLUSION

I respectfully dissent from the majority's application of 25 USC 1912(d) and (f) in this case. I would reverse the judgment of the Court of Appeals, vacate the order terminating respondent's parental rights, and remand this case to the trial court for further proceedings.

Michael F. Cavanagh
Marilyn Kelly