*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re S. C. DUNLAP-BATES, Minor.

UNPUBLISHED
February 18, 2021

No. 350597
Livingston Circuit Court
Family Division
LC No. 2016-015306-NA

Before: M. J. KELLY, P.J., and RONAYNE KRAUSE and REDFORD, JJ.

PER CURIAM.

Respondent-mother[1] (respondent) appeals as of right the trial court's order terminating her parental rights to the minor child[2] pursuant to MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), (g) (failure to provide proper care and custody), and (j) (reasonable likelihood of harm). Respondent argues that petitioner failed to undertake the "active efforts" required by the Indian Child Welfare Act (ICWA), 25 USC 1901 *et seq*, and the Michigan Indian Family Preservation Act (MIFPA), MCL 712B.1 *et seq*., to provide services to avoid termination; she also argues that termination was not in the child's best interests. We affirm.

## I. FACTS AND PROCEEDINGS

On July 26, 2016, the child and her older siblings, LD and WD, were removed from respondent's care. The child was ten years old at the time. In an amended petition, petitioner alleged that on July 7, 2016, while respondent was in jail for drinking and driving, a party had occurred at respondent's home, and then-15-year-old LD reported that she was drugged and sexually assaulted at that party. According to the minor child, respondent worked at night, respondent left LD in charge of the child and WD, and LD often had parties while respondent was at work. On July 27, 2016, then-12-year-old WD was found wandering six miles away from home without shoes. The children were currently sleeping in a camper that had no utilities, food, or

---

[1] The child's father released his parental rights and is not a party to this appeal.

[2] The child's older siblings were originally involved in the proceedings, but one of them turned 18 during the proceedings, and the goal for the other was changed to guardianship, so they were not the subject of the termination hearing and are not at issue in this appeal.

ability to shower. The amended petition alleged that the family had a Child Protective Services (CPS) history, and both respondent and the child's father had criminal histories. The children were eligible for membership in the Sault Ste. Marie Chippewa Tribe (the Tribe), and the Tribe supported the children's removal. The Tribe was allowed to intervene in the matter.

Respondent entered a plea to certain sections of the petition, including the allegations that she had a CPS history dating back to 2000, the year the oldest child was born; she had a criminal history; the children had been left at home and had a party on the night that respondent was arrested for drinking and driving; and respondent was unsure how she was going to pay rent and thought that she and the children were going to be evicted. Respondent also admitted that she had stated that the children would not listen to her and she had difficulty controlling them, that WD was found wandering six miles from home with no shoes on, and that she had stated that she did not want to keep the children because she could not control them. Respondent admitted that while she was in jail, she initially refused to execute a power of attorney to allow LD to be medically treated for the rape until she was informed that the children would otherwise be immediately removed.[3] Petitioner emphasized that its theory was that respondent was either unwilling or unable to provide proper supervision and control of the children. The trial court found statutory grounds to take jurisdiction over the children with respect to respondent.

The trial court ordered respondent to participate in services and ordered that respondent may have supervised parenting time. Respondent initially participated in services related to her substance abuse and mental health issues. She also participated in parenting classes, but she continued to have inappropriate conversations with the child throughout the case.[4] Respondent also obtained housing and maintained employment. However, she continued to work a midnight shift; despite petitioner's concern throughout the proceedings that, consistent with the events that preceded the children's removal, respondent would not be able to provide proper supervision of the children while she worked at night. At one point, respondent briefly switched to a day shift, but then switched back to working midnights. Respondent's proposed plans for supervising the children while she worked at night, which included having LD watch the younger children, having her niece or neighbors watch the children, or installing a camera, were rejected by petitioner. In August 2018, respondent's parenting time with the child was suspended after the child reported that respondent had encouraged her to act out in her placement. In November 2018, respondent stopped attending therapy.

In December 2018, petitioner filed a supplemental petition seeking termination of respondent's parental rights pursuant to MCL 712A.19b(3)(c)(*i*), (g), and (j). Following the

---

[3] Petitioner continued to have difficulty throughout the case attempting to obtain respondent's permission to provide the child at issue with treatment for her mental health issues. On one occasion, the child was discharged from a counseling program she found helpful because respondent refused to consent to the child taking certain prescribed medication.

[4] Petitioner was particularly concerned with respondent discussing these proceedings with the children and using shaming tactics. For example, when the child asked respondent to consent to the prescribed medication noted in footnote 3, the child "reported that her mother embarrassed her by saying that she must be on her period."

termination hearing, the trial court found that petitioner established beyond a reasonable doubt that termination was proper pursuant to all three grounds. It further found that petitioner proved by clear and convincing evidence that active efforts had been made to prevent the breakup of the family, but were unsuccessful. The trial court also found, beyond a reasonable doubt, that continued custody of the child with respondent would result in serious emotional and physical damage to the child. Finally, the trial court found that termination of respondent's parental rights was in the child's best interests. On August 12, 2019, the trial court entered an order terminating respondent's parental rights to the child. This appeal followed.

## II. STANDARDS OF REVIEW AND GENERAL PRINCIPLES OF LAW

There is no dispute that the child is eligible for membership in the Sault Ste. Marie Chippewa Tribe, which intervened in this case, and therefore the ICWA and the MIFPA applied in these proceedings. *In re England*, 314 Mich App 245, 250; 887 NW2d 10 (2016). "Issues involving the application and interpretation of ICWA are questions of law that are reviewed de novo. A court's factual findings underlying the application of legal issues are reviewed for clear error." *In re Morris*, 491 Mich 81, 97; 815 NW2d 62 (2012) (citations omitted). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed[.]" *England*, 314 Mich App at 254 (quotation omitted).

In termination proceedings involving ICWA and the MIFPA, the trial court must find (1) "that at least one state statutory ground for termination was proven by clear and convincing evidence," (2) proof by clear and convincing evidence "that active efforts were made to prevent the breakup of the family," and (3) "proof beyond a reasonable doubt that the continued custody of the child by the parent would likely result in serious emotional or physical damage to the child." *In re England*, 314 Mich App at 253, 257-259 (quotation marks and citations omitted). " '[A]ctive efforts' require more than the 'reasonable efforts' required under state law," and the touchstone is that petitioner must "take[] the client through the steps of the plan" instead of simply requiring a respondent to satisfy certain goals. *In re JL*, 483 Mich 300, 321; 770 NW2d 853 (2009) (quotation omitted). Petitioner may not refuse to offer services based on its conclusion that doing so would be futile, but active efforts need not be infinite, "so there comes a time when [petitioner] or the tribe may justifiably pursue termination without providing additional services." *Id*. at 326-327.

Finally, "as in all termination proceedings, the trial court has a duty to determine, by a preponderance of the evidence, that termination is in the child's best interests before it can terminate parental rights." *In re England*, 314 Mich App at 253 (quotation omitted). At the best interests stage, the trial court must focus on the child rather than the parent. *In re Payne/Pumphrey/Fortson*, 311 Mich App 49, 63; 874 NW2d 205 (2015). The trial court may consider a wide variety of factors, including the bond between the parent and the child, the parent's parenting abilities, the child's needs for stability and permanency, the parent's compliance with the case service plan, how long the child had been in care, and the likelihood that the child could ever be returned to the parent's care. *Id*. at 63-64. The trial court may also consider "the [child's] well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014). A trial court's finding that termination is in a child's best interests is reviewed for clear error. *In re England*, 314 Mich App at 253-254.

## III. ACTIVE EFFORTS

Respondent argues that petitioner failed to make active efforts to reunify the family with regard to a plan to supervise the child if returned to respondent's care. Respondent asserts that petitioner should have suggested alterative supervision plans, considered LD as an option for supervising the child, and considered the child's ability to care for herself. Respondent also argues that petitioner failed to make active efforts to reunify the family because it required her to drive long distances for parenting time and failed to provide a natural family interaction in a natural family setting. Finally, she suggests that petitioner failed to make active efforts to reinstate parenting time after it was unjustifiably suspended.

" 'Active efforts' means actions to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and to reunify the Indian child with the Indian family." MCL 712B.3(a); MCR 3.002(1). "Active efforts require more than a referral to a service without actively engaging the Indian child and family." MCL 712B.3(a); MCR 3.002(1). However, "active efforts" does not mean "unlimited efforts." *In re JL*, 483 Mich at 326-327. Under the ICWA and the MIFPA, petitioner is required to do more than simply provide a referral; nevertheless, it remains incumbent upon respondent to undertake some of her own efforts to overcome the barriers to reunification.

Respondent first argues that petitioner made insufficient efforts to help her develop a plan to provide supervision for the child if the child were to be returned to respondent's care. At the termination hearing, respondent testified that her plan was for either her niece, her mother, or LD to watch the child at night while she was at work. Respondent believed that LD had demonstrated responsibility and that LD would be motivated by respondent paying her to watch the child. A review of the record amply disproves respondent's professed belief that having LD watch the child was in any way viable. LD displayed a history of emotional instability, going absent without legal permission, failing to complete her own services, refusing to follow rules, and even getting into legal trouble. Respondent contends that petitioner should have at least talked to LD; but in addition to the record evidence that LD was wholly unsuited to supervising the child, there was some evidence that LD might not even live with respondent anymore.[5] The foster care worker, DyWanda Knight, and the Native American Expert, Heidi Cotey, both disagreed that having LD watch the child was a viable plan. Our Supreme Court rejected a "futility test" for the provision of services, *In re JL*, 483 Mich at 326, but did not hold that petitioner was obligated to chase obvious dead-ends.

Respondent also suggested that her niece could watch the child, but the niece did not return Knight's calls. Respondent testified that the niece had a criminal record for possessing marijuana. In addition, respondent suggested at the termination hearing that her sister and mother could watch

---

[5] The child's court-appointed special advocate (CASA) also opined, after discussing the child's need for consistency and stability, that LP would not be an appropriate person to supervise the child because "[LP] is not her parent."

the child. However, respondent did not provide any details.[6] Respondent also proposed having her neighbors watch the children, but she did not even know her neighbors. Petitioner asked respondent for other names of individuals who could help, but she did not provide any.

Another plan proposed by respondent was for petitioner to purchase a camera to allow respondent to monitor who went in and out of her apartment. Knight did not believe that this plan would have prevented LD from holding another party in respondent's absence. Respondent's only plan was to call the children if she observed a problem on the camera. However, the child had recently absconded from her placement and required substantial supervision. Accordingly, the trial court did not err by finding that this plan was insufficient to keep the child safe. On appeal, respondent additionally suggests that the child would be old enough to take some responsibility for herself. At the time of the termination hearing, however, the child had recently engaged in substance abuse, ran away, and been referred for inpatient services. Knight testified that the child needed a lot of supervision. The record further supports that the child needed a consistent and supportive environment. Accordingly, the evidence demonstrated that having the child care for herself was not a viable option.

Respondent argues that petitioner only advised her to change from working midnight shifts to working daytime shifts. Respondent argues, and we agree, that working daytime shifts would only partially address the supervision issue, because as a single working mother, it is simply impossible for her to watch the children at all times. Respondent also opined that it was better for the children if she was around "when they would be doing schoolwork or being active and up and moving around" than when they were sleeping or in school. Nevertheless, respondent admitted that she continued to work midnights despite petitioner's repeated urging (and despite briefly changing to a day shift) mostly because that was the time she preferred to work. Respondent also agreed that supervision of the children was one of the most significant concerns in the case.

Knight admitted that she did not search for any potential services to assist respondent while she worked. However, she was not aware of a list of approved caregivers for midnights, and she did not believe that respondent's budget would have allowed her to hire a professional babysitter overnight. Knight testified that there were many services and programs available during the work day. All other things being equal, respondent's reasoning for continuing to work a midnight shift is not unreasonable. However, the evidence was that *no* viable solution to the supervision problem was available while she worked midnight shifts. In contrast, working day shifts would be a partial solution and would make further complete solutions realistically available. Respondent testified that she would be willing to change shifts if necessary. However, she then backtracked and explained that she did not want to change to day shifts and would not do so at her current job, and would only "maybe" find a new job. The evidence indicated that petitioner had consistently expressed that respondent needed to change to working a day shift to ensure that the children could

---

[6] Respondent does not mention these individuals as potential options in her brief on appeal. Moreover, respondent's mother had refused to allow inspections of her home during the proceedings. Knight also testified that respondent had brought her mother to parenting time and this was not appropriate because respondent's mother had not had the necessary background check.

properly be supervised. Nevertheless, respondent only did so briefly, despite her repeated statements throughout the case that she was willing to change to working day shifts.

We recognize that different people are naturally more comfortable with different schedules. Nevertheless, the fact that the only viable supervision options required respondent to do something unenjoyable does not establish that petitioner did not make active efforts to find and propose viable supervision options. The trial court did not err by finding that petitioner made active efforts to explore and devise an appropriate supervision plan, but that respondent simply refused to make the changes in her own life that were necessary to implement any viable supervision plan.

Respondent additionally argues that petitioner failed to make active efforts because she was not allowed parenting time with all three children in a natural setting and was required to drive long distances. MCL 712B.3(a)(*viii*) requires, in pertinent part, that petitioner make "arrangements to provide natural and family interaction in the most natural setting that can ensure the Indian child's safety, as appropriate to the goals of the Indian child's permanency plan . . . " In this case, the children were in different placements in different cities. In 2017, respondent began having separate parenting time with each child. Respondent points out that she needed to drive several hours to visit the children. Knight testified that petitioner had offered transportation assistance to respondent, but respondent had declined. Cotey testified that arranging a natural family interaction in the most natural family setting was required when possible. Cotey was not surprised that parenting time with all three children was not provided in this case given the circumstances.

Respondent makes a fair argument that it would have been more natural to have visits involving all three children at once, and she should not have been required to do all of the driving. However, given the children's various problems and placements, it is not clear from the record that regular joint sessions were actually possible, nor is it clear that driving the children around would have ensured their safety. In other words, respondent fairly characterizes what would have been ideal, but she does not address the challenges that would have needed to be overcome or establish that it would have been feasible. Furthermore, despite the difficulty respondent encountered in making it to parenting time visits, the logs of those visits show that respondent generally made it to the visits, and her interactions with the child were, up to a point, generally positive. Although respondent was not able to have visits with all three children at once, there is no evidence that "the most natural setting that can ensure the Indian child's safety" was not provided.

Lastly, respondent argues that active efforts to restart parenting time were not made and the unjustified suspension of parenting time was the largest barrier to reunification. Respondent's parenting time was suspended in August 2018, after the child reported that respondent had instructed her to act out in her placement. Respondent accurately observes that the parenting time log for the August 8, 2018, visit that preceded the acting-out incident does not reflect the parenting coach observing any inappropriate conversations. In contrast, the parenting coach did note two inappropriate "whispered" conversations at a different parenting time visit almost a month

previously, and, as noted, the parenting time visit logs up to that date had been generally positive.[7] Rather, the child's court-appointed special advocate (CASA), Kendra Banafshe, testified that she directly talked to the child, and the child told Banafshe that respondent had instructed the child to misbehave and act out. Respondent argues that the suspension of her parenting time was based on improper hearsay, but the rules of evidence did not apply at the hearing on the motion to suspend parenting time. See MCR 3.901(A)(3). The trial court did not err in suspending respondent's parenting time.

Furthermore, from August to November 2018, respondent had not made any progress that would have supported a resumption of parenting time. At the November 28, 2018 review hearing, respondent's attorney informed the court that respondent had previously lied about not having had contact with WD when he had gone absent without legal permission (AWOLP). She had also stopped attending therapy and had one diluted drug screen. At that hearing, the child's permanency planning goal was changed to termination.

Respondent also argues that the trial court erred by relying on "one minimally informed source rather than on the fully knowledgeable staff of persons who had worked directly with the respondent over an extended period[.]" *In re JK*, 468 Mich 202, 212; 661 NW2d 216 (2003). Specifically, respondent argues that the trial court improperly relied on the opinions of Knight, Cotey, and Banafshe, rather than respondent's service providers. Respondent points out that the parenting time logs were generally positive, and she received positive reports the effect that she was unusually actively engaged in a parenting program. However, unlike the sources in *In re JK*, Knight, Banafshe, and Cotey were not "minimally informed" and had not merely met with respondent one time; rather, they were highly involved in and familiar with the case. Furthermore, as discussed, although the parenting time logs were generally positive, there was evidence that they were incomplete. Furthermore, respondent simply abandoned her therapy, and there was also evidence she had not significantly improved her emotional stability. After respondent's parenting time was suspended, she was also not honest with the court about WD. Accordingly, the trial court did not err by finding that respondent had not benefited from the parenting services, despite the opinions of the parenting-time service providers.

In sum, the trial court did not clearly err by finding that active efforts to prevent the breakup of the family were proven by clear and convincing evidence.

## IV. SERIOUS EMOTIONAL OR PHYSICAL DAMAGE

"Under 25 USC 1912(f), '[n]o termination of parental rights may be ordered . . . in the absence of a determination, supported by evidence beyond a reasonable doubt, . . . that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.' " *In re JL*, 483 Mich at 318. Evidence that continued custody is likely to result in serious emotional or physical damage to the child must include supporting testimony from at least one expert witness knowledgeable in the Indian tribe's child-

---

[7] The logs show that a different person substituted for the regular parenting coach at the August 9, 2018, visit; and there was some indication that the substitute for the regular parenting coach sat out of earshot for at least some of that visit.

rearing practices, no matter how obvious the probable harm might otherwise seem. *In re Payne*, 311 Mich App at 60-62. Respondent argues that the expert testimony regarding "serious emotional or physical damage" did not satisfy the beyond-a-reasonable-doubt standard because the expert did not offer any evidence to support her testimony. She further argues that although the evidence may have shown family poverty, isolation, and single parenthood, this is insufficient to satisfy the standard under 25 CFR 23.121(d). We disagree.

In relevant part, 25 CFR 23.121 provides:

(c) For a foster-care placement or termination of parental rights, the evidence must show a causal relationship between the particular conditions in the home and the likelihood that continued custody of the child will result in serious emotional or physical damage to the particular child who is the subject of the child-custody proceeding.

(d) Without a causal relationship identified in paragraph (c) of this section, evidence that shows only the existence of community or family poverty, isolation, single parenthood, custodian age, crowded or inadequate housing, substance abuse, or nonconforming social behavior does not by itself constitute clear and convincing evidence or evidence beyond a reasonable doubt that continued custody is likely to result in serious emotional or physical damage to the child.

Thus, respondent correctly argues that poverty, single parenthood, inadequate housing, substance abuse, or nonconforming social behavior are insufficient by themselves to establish a likelihood that a child will likely be harmed in a parent's custody.

However, the evidence, including Cotey's expert opinion testimony, reflected that respondent and the children all had serious emotional problems that interfered with their ability to function. Cotey's opinion was supported by her knowledge of and involvement in the case. Respondent unilaterally ended her therapy without much benefit and consistently failed to show a willingness to provide a supportive and supervised environment. The child had a severe need for stability and support that respondent clearly was unable to provide and, in fact, that respondent undermined throughout the case. Furthermore, the fact that evidence of probable harm must include expert testimony does not necessarily mean the expert testimony must be sufficient by itself. Accordingly, the trial court did not err by finding beyond a reasonable doubt that continued custody of the child by respondent was likely to result in serious emotional or physical damage to the child.

## V. STATUTORY GROUNDS

Respondent argues that because active efforts were not made, the statutory grounds for termination were not established. As discussed above, we disagree.

The trial court did not err by finding that the statutory grounds for termination were established by clear and convincing evidence. The trial court found that termination was proper pursuant to MCL 712A.19b(3)(c)(*i*), (g), and (j), which provide:

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

* * *

(g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

* * *

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

With regard to MCL 712A.19b(3)(c)(*i*), the trial court found that the initial petition was filed because of concerns regarding lack of supervision, substance abuse, criminality, lack of parenting skills, mental health, and emotional instability. It found that only the issue of criminality had been rectified. The trial court did not err by finding that the other conditions had not been rectified. In particular, as discussed earlier, respondent did not have an adequate supervision plan for the child, especially given the child's needs at the time of the termination hearing. With regard to substance abuse, there was evidence that respondent completed her treatment and had generally provided clean drug screens, but had not benefited. According to Knight, respondent was still in denial of her substance abuse diagnosis and she refused to continuously engage in counseling. The last time that respondent attended Alcoholics Anonymous or Narcotics Anonymous on a weekly basis was November 2018. Respondent had also reported self-treating her depression with marijuana.

With regard to respondent's parenting skills, we recognize that respondent completed her parenting skills program with a commendation for her engagement, and she had put considerable effort into creating a household budget. Nevertheless, Knight testified that, after respondent received parenting services, she still used her emotion over logic, used shaming as a method of parenting, and was untruthful. As discussed earlier, respondent's parenting time was suspended because she encouraged the child to act out. In the fall of 2018, when WD was AWOLP, respondent lied to the court about whether she had contact with WD or knew of his whereabouts. When WD was with her, she did not provide for his educational or medication needs. "Evidence of how a parent treats one child is evidence of how he or she may treat the other children." *In re Hudson*, 294 Mich App 261, 266; 817 NW2d 115 (2011). Furthermore, respondent denied the contents of the child's trauma report, which impacted her ability to support the child's mental health issues. Thus, the evidence tended to show that whatever benefits respondent gained from

-9-

the parenting skills program in theory, she continued to have difficulty implementing those skills in practice.

Finally, respondent was not treating her mental health at the time of the termination hearing. Knight testified that respondent had reached her "maximum benefit" of counseling in October 2017, and respondent was not following the therapist's directions and recommendations. It was explained that "maximum benefit" did not pertain to reaching a limitation on what was allowed, but rather that respondent had achieved as much stabilization or psychological improvement in therapy as she could be expected ever to achieve. "Maximum benefit" also considers respondent's refusal to work with the therapist. In other words, additional therapy would not be useful to her, not that additional therapy would not be permitted. In June 2018, she reengaged in counseling, but failed to benefit, missed appointments, and then stopped attending. Although it would not seem entirely inappropriate to discontinue therapy that was of no further benefit, the evidence, including her self-medication, tended to show that respondent was proceeding to reject and retreat from whatever benefit she might have attained.

Considering respondent's failure to fully comply with services and lack of benefit, the trial court also did not clearly err by finding no reasonable likelihood that these conditions would be rectified within a reasonable time considering the child's age.

With regard to MCL 712A.19b(3)(g), "[a] parent's failure to participate in and benefit from a service plan is evidence that the parent will not be able to provide a child proper care and custody." *In re White*, 303 Mich App at 710. Similarly, with regard to MCL 712A.19b(j), "[a] parent's failure to comply with the terms and conditions of his or her service plan is evidence that the child will be harmed if returned to the parent's home." *Id.* at 711. As discussed earlier, respondent failed to fully comply and benefit from her service plan. This was evidence that she could not provide the child with proper care and custody and that the child would be harmed if returned to her care. Respondent focuses on the parenting-time logs, which showed that she was bonded with the child, but that bond was never in serious doubt, and she fails address the trial court's other findings.

In sum, the trial court did not clearly err by finding that the statutory grounds for termination were proven by clear and convincing evidence.

## VI. BEST INTERESTS

Respondent also argues that termination of her parental rights was not in the child's best interests. We disagree.

Respondent argues that the parenting-time logs do not support the trial court's finding that termination of her parental rights was in the child's best interests. She also emphasizes that she provided clothes, paid child support, and (eventually) signed off on the child's medication after consulting with the doctors. Standing alone, we do not disagree. The parenting-time logs did provide positive feedback regarding respondent and showed the existence of a bond between respondent and the child when they were together. There was, in fact, ample evidence that all three children loved respondent and that respondent loved the children. However, the evidence suggested that the bond between respondent and her children was not healthy, and in any event,

the existence of a bond is only one factor. We also note that the child, unprompted and of her own volition, drafted a letter and created a video on December 30, 2018, in which she described feeling safe and supported in her placement and expressly stated her wish to be adopted; although several months later, during the termination hearing, she attempted to run away and was placed in a juvenile facility. The CASA opined that termination was in the child's best interests because her needs seemed to be getting more pronounced and she needed immediate consistency and structure that respondent could not provide.

For the reasons discussed earlier, the child would not be properly cared for, supervised, or kept safe in respondent's care. Respondent did not have an adequate plan for supervision of the child while she worked the night shift, she did not display adequate parenting skills, and she was not managing her substance abuse or mental health. The child required substantial supervision and needed to be involved in consistent mental health treatment. There was no evidence that respondent could provide for these needs. In other words, the child had severe mental health needs that called for an exceptional amount of supervision, support, and stability; and respondent's conduct made it clear that she was neither willing nor able to provide enough of any of those things. Furthermore, even though the grandparents were apparently no longer willing to adopt the child at the time of the termination hearing, Banafshe was hopeful that the child could still be returned to the grandparents at some point.[8] Cotey believed that termination was proper even if the grandparents were not willing to adopt the child. The trial court did not clearly err by finding by a preponderance of the evidence that termination of respondent's parental rights was in the child's best interests.

Affirmed.

/s/ Michael J. Kelly
/s/ Amy Ronayne Krause
/s/ James Robert Redford

---

[8] Banafshe clarified that the grandparents had not communicated any such unwillingness to her personally, and any statement they made to that effect coincided with the child's recent placement, after the most recent incident of trying to run away, in an inpatient mental health facility.