*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* VARY/WILSON, Minors.

UNPUBLISHED
February 24, 2022

No. 357545
Jackson Circuit Court
Family Division
LC No. 17-003108-NA

Before: CAVANAGH, P.J., and JANSEN and RIORDAN, JJ.

PER CURIAM.

Respondent-mother appeals by right the trial court order terminating her parental rights to the minor children, KV and RW, under MCL 712A.19b(3)(c)(*i*) (conditions of adjudication continue to exist and are not likely to be rectified within a reasonable time) and (j) (reasonable likelihood that child will be harmed if returned to parent). The trial court also terminated the parental rights of the children's fathers, EV and GW, who are not parties to this appeal. We affirm.

## I. BACKGROUND

KV was born to mother and respondent-father EV in August 2017, when both mother and EV were 16 years old. In November 2017, the Department of Health and Human Services (DHHS) petitioned to remove KV from their care due to domestic violence and neglect. EV was charged with assault with intent to murder, assault by strangulation, carrying a dangerous weapon, carrying a concealed weapon, and unlawful intent, for an incident in which mother was the victim. The DHHS also alleged that mother failed to provide proper medical care for KV, and left him with his maternal grandmother for nearly a week without telling anyone where she went. KV was removed from respondents' care, and mother entered a parent-agency treatment plan with services tailored to her young age—parenting classes, supervised parenting time, a psychological assessment, a substance abuse assessment and drug screens, maintaining housing, job assistance, and working toward graduating from high school. Based on mother's age and the results of her psychological evaluation, she was offered hands-on parenting time instruction from an experienced, unbiased aide.

Despite being offered and completing services regarding domestic violence, and excelling in therapy, mother continued to be involved in domestic violence throughout the years of these proceedings. In May 2018, mother had bruises and scratches on her face and neck during

visitation, but denied having been abused. Mother's second child, RW, was born to her and respondent-father GW in 2019. Shortly after RW's birth, she was removed from respondents' care due to domestic violence between mother and GW. Mother had a pending charge for assault with a dangerous weapon and domestic violence for an incident in which she tried to cut GW with scissors while he was holding RW. On another occasion, the maternal grandmother witnessed GW and his sister beating mother up. Mother had a black eye in February 2020 as a result of an interaction with GW, which she claimed was not domestic violence.[1]

Mother was also arrested and incarcerated several times during the course of the proceedings. She shoplifted, and on different occasions was charged with assault and battery, disorderly conduct, and illegal sale on a financial transaction device. In 2020, mother's car was involved in a shooting, but mother denied being present or involved. She was imprisoned from January to March 2021, shortly before the termination hearing took place. She assaulted other inmates at least twice, and threatened the children's relative placements as recently as the first day of the termination hearing.

The DHHS requested a goal change to termination of parental rights several times over the years, and it was continuously postponed in consideration of mother's young age, allowing her more time to participate and show benefit from services. Ultimately, however, the trial court granted the petition and terminated mother's parental rights. The court acknowledged that mother loved her children, and participated in services, but concluded that she did not benefit. She continued to be aggressive and the victim of domestic violence. The court found that statutory grounds to terminate existed under MCL 712A.19b(3)(c)(*i*) and (j), and that termination was in the children's best interests because both children were doing well in preadoptive relative placements.

## II. REASONABLE ACCOMMODATIONS

Mother first argues that the trial court erred in determining that reasonable efforts were made to reunify mother with the children because the DHHS failed to provide her with reasonable accommodations given her young age and intellectual capacity. We disagree.

To preserve a challenge to reasonable efforts, a respondent must challenge the adequacy of the services provided in the trial court when the court adopts a service plan. *In re Terry*, 240 Mich App 14, 26-27; 610 NW2d 563 (2000). Mother's attorney did not raise a challenge under the ADA until the termination hearing. Therefore, this issue is unpreserved, and the trial court's findings regarding reasonable efforts are reviewed for plain error affecting substantial rights. *In re VanDalen*, 293 Mich App 120, 135; 809 NW2d 412 (2011). To establish plain error, a party must show that an error occurred, the error was clear or obvious, and the error affects the party's substantial rights. *Id*. This Court gives regard to the special opportunity of the fact-finder to judge the credibility of witnesses. *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989).

Generally, the DHHS must make reasonable efforts to reunify a family before seeking termination of parental rights. *In re Smith*, 324 Mich App 28, 43; 919 NW2d 427 (2018). The DHHS must make a service plan that outlines the steps that the DHHS and the parent will take to

---

[1] Mother gave birth to a third child, DW, in 2020, who is not subject to this appeal.

rectify the conditions that led to the petition and to achieve reunification. *In re Hicks/Brown*, 500 Mich 79, 85-86; 893 NW2d 637 (2017), citing MCL 712A.18f(3)(d). Once the DHHS is aware of a parent's disability, it has a duty to make accommodations. *Id*. at 87-88. Reasonable efforts may include efforts such as referrals for services and efforts by the DHHS to engage respondents in services. *In re JL*, 483 Mich 300, 322 n 15; 770 NW2d 853 (2009). "The adequacy of the petitioner's efforts to provide services may bear on whether there is sufficient evidence to terminate a parent's rights." *In re Rood*, 483 Mich 73, 89; 763 NW2d 587 (2009).

Mother was only 16 years old when her first child was removed from her care. She argues that she reported not understanding what she needed to do, which was reflected in various points in the lower court record. However, in response, the trial court gave mother specific directions, including more information than the trial court routinely provided parents. The trial court repeatedly referred to mother's age, and instructed the DHHS to make efforts to provide mother with specific assistance.

Mother's attorney challenged the DHHS's recommendation to change the goal to termination in January 2019, and argued that mother's domestic violence services only began months after mother's dispositional hearing, and that mother was engaging in therapy. As a result, the trial court stated that it would ensure that the DHHS did everything that it could "within a reasonable period of time to effectuate reunification," and did not change the goal to termination, but instead ordered services to address the issues. Mother's attorney again challenged the services in April 2019, and argued that the case was opened in November 2017, but mother was not referred to therapy until October 2018. The trial court explained in the same hearing that it could not stop the DHHS from filing for termination, but it could adjourn the hearing for all the parties to be on the same page about what had been ordered so that they did not "fail the family." The trial court also told the caseworker, Whitney Dibiosso, to provide mother's attorney with a list of what mother needed to do by the following day, and it adjourned the hearing

Although mother argues that the DHHS did not make accommodations because mother's services were "not out of the realm for other cases like hers," another caseworker, Seana Watson, testified that no other parents were receiving hands-on parenting instruction at the time, and she could only think of one other parent who received that. Watson testified that they tried to ensure the parents' needs were being met, and that they made "special and additional accommodations to ensure that [mother] understood what was happening with her case." Watson testified that the agency made efforts to find hands-on parenting instruction and had a visit supervisor, who was a retired special education teacher, provide hands-on assistance during visits. Mother then received hands-on instruction in 2020. Further, Watson testified that the agency provided extra communication with mother, including holding family team meetings monthly rather than every three months. Watson testified that the agency "really tried to consistently communicate with [mother] about the severity of these concerns, about what's being asked of her, and to make sure she understands that, and also, that we can be checking on her progress."

Additionally, despite mother's claim that she did not know what to do, mother completed most of her services, indicating that she understood how to participate in her service plan. The issue, as further discussed below, is that mother did not benefit from the services, nor did mother appear to recognize the barriers to reunification. See *In re TK*, 306 Mich App 698, 711; 859 NW2d 208 (2014). Further, as the DHHS and the lawyer-guardian ad litem (L-GAL) argue, mother has

not identified what additional services would have better accommodated her needs other than the accommodations that the trial court and the DHHS provided during the case. The trial court specifically stated that it thought that the DHHS had personalized services for mother, and it did not know what other steps that the DHHS could have taken. Only in March 2021, over two years after the psychological evaluation, did mother's attorney raise the issue of mother having the mental abilities of a fifth grader. The DHHS had an affirmative duty to make accommodations, *In re Hicks/Brown*, 500 Mich at 87-88, and it seemingly made extensive efforts to work with mother and accommodate her needs.

Although mother argues that the trial court made it mother's fault for not speaking with her attorney, there was also no indication that mother was unable to participate in services or that the DHHS failed to tailor services to her needs. Further, the trial court was clearly sympathetic to mother and made efforts to accommodate her, including providing a planner for mother to write down her appointments, and specifying the steps that mother needed to take. Moreover, Watson testified that mother did not appear to struggle to understand what was happening. Therefore, the trial court did not err by finding that the DHHS made reasonable efforts, which also fulfilled the DHHS's responsibility under the ADA. See *In re Terry*, 240 Mich App at 26-27.

## III. STATUTORY GROUNDS

Mother next argues that there was not clear and convincing evidence that statutory grounds for termination existed. We disagree.

This Court reviews for clear error a trial court's finding that a statutory ground for termination existed. *Id.* at 22. Clear error exists when this Court is left with a definite and firm conviction that the trial court made a mistake. *Id.* A trial court's finding of a statutory ground for termination must be supported by clear and convincing evidence. *Id.* at 21-22.

Mother correctly argues that the trial court erroneously relied on MCL 712A.19(b)(3)(c)(*ii*) in its findings. However, the trial court specifically referred to the language of MCL 712A.19b(3)(c)(*i*), and made findings consistent with that ground for termination. The trial court's speaking error does not alone warrant reversal, particularly when the DHHS requested termination on the correct basis and the trial court made the appropriate findings. Crucially, the trial court did not clearly err by finding that 182 days had passed since the initial dispositional order, that conditions that led to the adjudication continued to exist, and that there was no reasonable likelihood that the conditions would be rectified within a reasonable time considering the child's age. See MCL 712A.19b(3)(c)(*i*).

First, the trial court entered mother's initial dispositional order for KV on February 23, 2018, which was approximately 39 months before the termination hearing began and well beyond the 182 days required under MCL 712A.19b(3)(c). Likewise, the trial court entered mother's initial dispositional order for RW on October 18, 2019, which was approximately 19 months before the termination hearing began and well beyond the 182 days required under MCL 712A.19b(3)(c).

Next, the conditions that led to the adjudication primarily involved domestic violence, and mother continued to be involved in domestic violence throughout the pendency of the case.

-4-

Specifically, mother had a black eye in February 2020, as a result of GW headbutting her, and mother engaged in domestic violence in August 2019, by attempting to cut Watson's clothing. KV specifically entered care as a result of EV shooting at mother's car, and mother's car was involved in a shooting in October 2020. Additionally, mother engaged in threatening behavior toward RW's placement on the first day of the termination hearing.

Finally, there was no reasonable likelihood that mother could rectify the conditions in a reasonable time considering the children's ages. See MCL 712A.19b(3)(c)(*i*); *In re Williams*, 286 Mich App 253, 272-273; 779 NW2d 286 (2009). Despite over three years of services, mother continued to engage in aggressive behaviors, including threatening RW's placement, and she had been incarcerated for the third time during the case as recently as January 2021 through March 2021. Mother stopped engaging in most services in fall 2020, well before the termination hearing began in May 2021, making it unlikely that mother would benefit from services meant to address her continued domestic violence concerns.

KV had already been in care for nearly two years by the time RW was removed from mother for continuing issues of domestic violence, and both children had been in care for most of their lives by the time of the termination hearing. After over three years of services, there was no indication that mother would be able to benefit from more services and make progress in a reasonable amount of time to provide stability, permanence, and finality for the children. See *Matter of Dahms*, 187 Mich App 644, 647-648; 468 NW2d 315 (1991). Therefore, the trial court did not err by finding that evidence supported termination under MCL 712A.19b(3)(c)(*i*).

The trial court also did not clearly err by finding that there was a reasonable likelihood that the children would be harmed if they were in mother's care under MCL 712A.19b(3)(j). See *In re Moss*, 301 Mich App 76, 82; 836 NW2d 182 (2013). Mother continued to engage in aggressive behaviors and be involved in dangerous situations throughout the over three years of the case. There were allegations of domestic violence throughout the case even after mother completed domestic violence services, including an allegation that mother used scissors to attempt to cut GW's shoes while he was holding RW. KV was taken into care because of EV shooting a gun at mother while she was in her car, and mother's car was again involved in a shooting in October 2020. Moreover, mother posted a video in August 2020, showing that she was with people who were "flashing guns."

Mother was incarcerated in the months leading up to the termination hearing, and Watson testified that mother assaulted other inmates at least twice during her incarceration, indicating mother's lack of benefit from services. Mother threatened RW's placement as recently as the first day of the termination hearing, illustrating mother's continued dangerous behaviors. The trial court referred to mother's behaviors in court as one basis for its belief that mother was aggressive, and this Court gives deference to a trial court's ability to make observations during a case when making its findings. See *In re Miller*, 433 Mich at 337. Therefore, the trial court did not err by finding clear and convincing evidence that there was a reasonable likelihood that the children would be harmed if returned to mother's care. See *In re Moss*, 301 Mich App at 82.

## IV. BEST INTERESTS

Lastly, mother argues that the trial court erred by finding that termination was in the best interests of the children. We disagree.

This Court reviews for clear error a trial court's finding that termination was in a child's best interests. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). Clear error exists when this Court is left with a definite and firm conviction that the trial court made a mistake. *In re Terry*, 240 Mich App at 22. A trial court must find by a preponderance of the evidence that the termination was in the child's best interests. *In re Moss*, 301 Mich App at 90.

Under MCL 712A.19b(5), the trial court must find, in addition to statutory grounds for termination, that the termination is in the child's best interests. The trial court may consider "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts Minors*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012) (citations omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App at 714. The focus is on the child rather than the parent. *In re Moss*, 301 Mich App at 87. A trial court must explicitly consider the fact that a child is in the care of a relative at the time of the termination hearing because a relative placement weighs against termination. *In re Olive/Metts Minors*, 297 Mich App at 43.

Although mother argues that Watson never testified about how the children were doing in their placements, Watson testified that KV was "doing very well" in his placement. Watson further testified that RW was "doing very well" in her placement, and was "very happy," healthy, and had no developmental concerns. During this testimony, the trial court was only focused on the respondent-fathers, EV and GW, because mother's attorney had objected to questions about mother on the basis that mother initially expressed interest in releasing her rights, but Watson's answers about the children's well-being in their placements was unrelated to mother, EV, or GW, and instead focused exclusively on how the children were doing in their placements. Watson also specifically testified that she thought that it was in the children's best interests to terminate mother's parental rights.

Both KV and RW had been in their placements for most of their lives. Watson testified that KV's placement was his family, and each of the children's placements wanted to adopt them. See *In re Gonzales/Martinez*, 310 Mich App 426, 435; 871 NW2d 868 (2015). Mother additionally argues that the trial court failed to consider review hearing information when making its determination. However, considering the review hearing testimony, the L-GAL and caseworkers repeatedly testified during review hearings about the children doing well in placement, and there was testimony about mother's lack of bond with KV.

Mother additionally argues that the trial court erred by failing to consider the best interests of each child individually. This Court has held that the trial court should address the children's best interests individually *if* they "*significantly* differ." See *In re White*, 303 Mich App at 715. However, a trial court does not err when it "fails to explicitly make individual and—in many cases—redundant factual findings concerning each child's best interests." *Id*. at 716. In this case,

the trial court explicitly considered the best interests of the children, whose interests did not significantly differ. Therefore, the trial court did not err by not making individual findings.

The trial court also properly considered whether termination was necessary despite the children being in relative placements. *In re Olive/Metts Minors*, 297 Mich App at 43. Further, the trial court properly considered factors including mother's ongoing history of domestic violence. *In re White*, 303 Mich App at 714. As the DHHS and L-GAL argue, the children deserved permanency, and there was no likelihood that mother could provide that for the children in a reasonable time. Therefore, the trial court did not clearly err by finding that it was in the children's best interests to terminate mother's parental rights. See *id*. at 713.

Affirmed.

/s/ Mark J. Cavanagh
/s/ Kathleen Jansen
/s/ Michael J. Riordan