*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re BOWERMAN, Minors.

UNPUBLISHED
May 16, 2024

No. 367246
Alger Circuit Court
Juvenile Division
LC No. 16-004506-NA

In re BOWERMAN, Minors.

No. 367506
Alger Circuit Court
Juvenile Division
LC No. 16-004506-NA

Before: JANSEN, P.J., and MURRAY and O'BRIEN, JJ.

PER CURIAM.

In these consolidated appeals, respondent-mother and respondent-father appeal as of right the order terminating their parental rights to the four minor children under MCL 712A.19b(3)(c)(*i*) and (*ii*). The four children are members of the Sault Ste. Marie Tribe of Chippewa Indians (the tribe), and there is no dispute that they are Indian children for purposes of the federal Indian Child Welfare Act (ICWA), 25 USC 1901 *et seq*. and the Michigan Indian Family Preservation Act (MIFPA), MCL 712B.1 *et seq*. Respondent-mother contends that petitioner, the Department of Health and Human Services (DHHS), failed to make active efforts to preserve this Indian family contrary to 25 USC 1912(d) and MCL 712A.15(3). Respondent-father challenges the evidentiary support for the termination decision. Discerning no error, we affirm.

## I. BACKGROUND

Respondents were together for several years and had four children between 2014 and 2021. In December 2020, Children's Protective Services (CPS) intervened after a report that respondent-mother beat respondent-father with a sheathed knife in front of three of the children. When the CPS investigator went to respondents' home, he found the family living in an uninhabitable house. The home lacked utilities, and it was so filled with garbage and clutter that the exits were blocked and there were no clear paths to walk. CPS and the tribe immediately instituted various services

-1-

to assist respondents. Two 10-yard dumpsters were brought to the house and filled to rectify the condition of the home. By mid-July 2021, CPS believed respondents' file would soon be closed.

In August 2021, however, respondent-mother was arrested for driving under the influence with two of the children in the car. She tested positive for opiates, benzodiazepines, Buprenorphine (Suboxone), and THC; she did not have an opiate or benzodiazepine prescription. When the CPS investigator came to the family home for a welfare check after the arrest, he discovered the home was again unsanitary and cluttered.

Determining that respondents had not benefitted from services, the DHHS filed a petition to take jurisdiction. Respondent-mother entered a plea to the factual allegations establishing jurisdiction. Respondent-father requested a trial and was not adjudicated until May 2022. In the meantime, the condition of the family home further deteriorated. The children's lawyer-guardian ad litem reported that there were no clear paths to walk through the home; tables and counters were piled high with garbage, food, and dirty dishes; the children were sleeping on bare mattresses; and the stairwell had no railing. Rather than clean the home and return it to habitable conditions, respondent-mother and the children moved in with respondent-mother's grandmother (the children's maternal great-grandmother). Respondent-father traveled between the family home and couches of friends and relatives. Due to the conditions of the family home, the court ordered respondents to not allow the children to return to it. During this time, respondents were offered services, including family-continuity services through Sault Tribe Family Continuity, housing assistance, counseling, and drug screens. Both respondents unfortunately avoided any meaningful participation in the offered services. For instance, according to a report prepared for the court, a caseworker referred respondent-mother to Boot Lake Counseling Service, and she was scheduled for an intake counseling session on January 5, 2022 but was a no-call no-show.

In August 2022, police were summoned to the former family home. It appeared that respondents were living in the home with the children again in violation of the court's orders. The officers described the home as "uninhabitable." When officers arrived, respondents were inebriated and had fought verbally and physically. Respondent-mother's blood alcohol content was 0.16, and respondent-father fled the scene before he could be tested. CPS took the children to their maternal great-grandmother's home for the night, but respondents absconded with them in the morning. This led the DHHS to file an emergency motion to take the children into care and an amended petition, both of which were granted. In a case service plan covering the period of August 22, 2022 to September 20, 2022, the DHHS described the services to prevent removal as follows:

> Pathways Community Mental Health, Sault Tribe Parenting Education with Jennifer Krueger, Sault Tribe Family Continuity Program Services, Access Psychological, Mental Health Counseling with Candice Dennis at the Sault Tribe, Alger County Probation/Parole Office, DHHS Drug Screening, MDHHS CPS investigation, Sault Tribe Parenting Education, Sault Tribe housing applications provided, Sault Tribe enrollment application provided, Munising Housing application provided, Sault Tribe utilities relief application[] provided[.]

Soon after removal, the children were placed in the care of a maternal cousin, who, for a few weeks, lived across the street from respondents' home. Respondents repeatedly threatened and terrorized the foster parents, with the effects flowing to their children. According to a report submitted to the court, the eldest child, who was eight years old at the time, asked to skip visits

because "she felt scared when her parents yelled and got angry during visits." After the child drafted a list of things respondents could do to help with her anxiety about the visits, respondent-mother "was openly resistant" to the list and yelled and insulted the child. In October 2022, the foster parents and the children moved to a home away from respondents' home. The foster parents also secured personal protection orders against respondents.

From September 2022 to December 2022, respondents continued to largely avoid participating in services. Respondent-mother had been diagnosed at some point in the past with depression and anxiety, and she reported that she was receiving therapy at Bell Women's Care. She signed a release for this service, but, unfortunately, no documents verifying this service appear in the record. While respondents attended parenting times during this period, the visits were often concerning, particularly due to respondent-mother frequently becoming upset and confrontational. Caseworkers noted that respondent-mother did not seem to recognize the damage that this conduct caused the children. It was also noted that the oldest child often reversed roles and parented respondent-mother during visits. A report prepared for the court stated that respondent-father was able to control his emotions alone but tended to become hostile when respondent-mother did. His conduct, unlike respondent-mother's, was directed only at caseworkers, not the children. But respondent-father did show up to one parenting time visibly intoxicated, and picked up the youngest child and dropped him on his face. Thereafter, respondent-father was required to screen for alcohol before each visit, and he tested negative each time. Both parents were referred to additional parenting classes.

Both parents also submitted to drug screens during this period. Respondent-mother was prescribed multiple medications (some to address her mental health issues), but her drug screens revealed that she was not taking those medications daily. She also tested positive for alcohol, methamphetamine, and amphetamines. Respondent-father tested positive for the medications that he was prescribed, but he also tested positive for alcohol, cocaine, THC, and Ritalin, which he did not have a prescription for. He also self-reported using methamphetamine.

As for housing, respondent-father continued living at the old family home. While progress had been made to the conditions of the home, the caseworker believed that the home was still unsafe for the children—it did not have heat or electricity. Respondent-mother continued living with her grandmother. A worker with Sault Tribe Family Continuity gave respondent-mother applications for independent housing, but respondent-mother had not completed the forms, saying that she had no intention of moving from her grandmother's home.

In January or February 2023, respondent-mother submitted to a psychological evaluation with psychologist Todd R. Silverstein.[1] Dr. Silverstein diagnosed respondent-mother with a personality disorder with paranoid traits, opioid use disorder (controlled by Buprenorphine or Suboxone), and stimulant use disorder. According to a case service plan, around the time of this visit, respondent-mother refused to disclose whether she was participating in any services, such as services to address her mental health or substance abuse. While she did ask for therapy with the

---

[1] The caseworker testified at the termination trial that respondent-mother received this service in January 2023, but other documents in the record suggest that she received this service in early February 2023.

oldest child to heal their relationship, the child's therapist opined that this would be damaging to the child.

Also in January 2023, according to the same case service plan, a caseworker visited respondent-father at the old family home and convinced him of the need for inpatient mental health treatment due to recent bouts of suicidal ideation. The case service plan states that the worker drove respondent-father to the hospital and remained until respondent-father was admitted. Respondent-father was discharged three days later with instructions to follow up with mental health treatment through Pathways and substance abuse programming at Great Lakes Recovery, but he chose not to meaningfully pursue those follow-up services.

The case service plan also details that, on February 1, 2023, respondent-mother told the caseworker that Pathways denied her mental health services. She further told the worker that she had a list of other therapists who could help her but did not know which ones would take her insurance. The caseworker responded by asking respondent-mother to provide the list of therapists and to give the worker her schedule so they could set up a meeting at which the caseworker could assist respondent-mother in finding a therapist who would take her insurance. According to the case service plan, after not hearing from respondent-mother, the caseworker attempted to follow-up, but respondent-mother either would not provide the relevant details or would not respond. The worker was eventually able to schedule the meeting with respondent-mother, and it took place on February 11, 2023. But when the caseworker tried to discuss respondent-mother's mental health treatment, respondent-mother told the caseworker "that her only mental concerns were due to her relationship with this worker." Respondent-mother then blamed the caseworker for not finding mental health services for her. The caseworker reminded respondent-mother that she had tried to contact respondent-mother for the past 10 days and respondent-mother refused to schedule a meeting. Respondent-mother eventually agreed to allow the caseworker to go to a meeting with respondent-mother and a tribal worker where they could discuss mental health treatment options. Respondent-mother also agreed to contact counseling services through the tribe.

The case service plan states that, at the ensuing meeting with the tribal worker on February 15, 2023, the tribal worker provided respondent-mother with information about counseling services. Respondent-mother represented that she had an appointment with a tribal counselor the following week, but there is nothing in the record suggesting that this appointment took place. The caseworker also offered to set up a psychological assessment for respondent-mother, but respondent-mother expressed misgivings about the offer.

Respondent-father was arrested on March 14, 2023, for carrying a concealed weapon, being a felon in possession of a firearm, and driving with an open container of alcohol. He was released on bond on March 18, 2023. On March 30, 2023, a search warrant was executed at respondents' family home while respondent-father was released on bond. The officers found ammunition (which respondent-father was not allowed to possess) and evidence supporting that the home was being used as a drug house.

At an April 10, 2023 hearing, respondent-mother's counsel represented that respondent-mother was on a waitlist for counseling services through the tribe, but no one was able to verify this information because respondent-mother did not sign the necessary release. At the end of the hearing, the court ordered the DHHS to file a termination petition.

At the July 20, 2023 termination trial, a Michigan State Police Trooper testified about the conditions of respondent-father's home when the trooper executed the search warrant on March 30, 2023. The trooper said that the home was "the worst house I had ever been in." He described syringes on the floor, controlled substances in the house, and human feces outside the bathroom.

The caseworker testified that respondent-mother participated in inpatient substance abuse treatment at Great Lakes Recovery from an unknown start date through April 23, 2023. Respondent-mother told the caseworker that she had successfully completed the program, but she would not sign a release of information so the caseworker had no way to verify respondent-mother's claim. The caseworker noted, however, that two days after respondent-mother was discharged from this program, she tested positive for cocaine. Respondent-mother had tested negative for illegal drugs since, but was also testing negative for Suboxone, despite claiming she received injections. Great Lakes Recovery advised the caseworker that respondent-mother had signed the consent for the injections but never returned to receive them.

As to respondent-mother's mental health, the caseworker reiterated that Dr. Silverstein had diagnosed respondent-mother with a personality disorder and opioid use disorder. The caseworker said that, in the same month that respondent-mother met with Dr. Silverstein (January 2023, according to the worker), she also did an intake at Pathways. The caseworker said that respondent-mother told the provider that "her only mental health concern was working with [the caseworker], so they denied her services at that point." The caseworker subsequently encouraged respondent-mother to try again and to be more forthcoming, but respondent-mother did not return to Pathways until July 3, 2023. She then refused to sign a release of information, so Pathways could only confirm that respondent-mother had done the intake and would be having weekly counseling sessions.

As to respondent-father, the caseworker testified that he had been incarcerated since June 18, 2023. According to the caseworker, before he was incarcerated, respondent-father was experiencing increasingly volatile mental health issues—at one point, he cancelled parenting-time sessions because he believed "bugs were coming out of his mouth"; at another point he tried to overdose on methamphetamine; he was hospitalized for suicidal ideations for three days in January 2023; and after he was released from the hospital, his mother contacted the caseworker because respondent-father threatened to kill several people, including one of the children's foster parents. This was consistent, according to the caseworker, with respondent-father's violent tendencies that he demonstrated throughout the case. The caseworker also detailed respondent-father's struggles with substance abuse and his failure to follow through with substance abuse treatment at Great Lakes Recovery.

The caseworker said that because of both respondents' volatile behavior, the children's foster placement was no longer willing to permanently plan for the children. The DHHS explored other relative placements, but none were suitable, and the tribe ultimately approved a local family who was willing to take all four children.

Heidi Nesberg, a caseworker with the tribe, testified that, after discussing the current case with the tribe's child welfare committee, she supported termination of respondents' rights. Nesberg had been involved in the case from the beginning. Nesberg opined that respondents had not benefited from the numerous services offered to them. According to Nesberg, respondents' mental health and substance abuse issues did not improve and respondents committed criminal

acts while the case was pending. Nesberg said that in the 13 years and 430 cases she had worked, she had not seen behavior like respondent-mother had exhibited throughout the case. Nesberg opined that respondent-father "seemed to be the stable parent," which she found concerning because respondent-father had gone downhill since December 2022, becoming more suicidal, testing positive for illegal drugs, and threatening to harm others. Nesberg summarized that both respondents have "extreme mental health" and substance abuse issues with no hope for improvement. Nesberg acknowledged respondent-mother's representation that she was on the waiting list for mental health services through the tribe, but Nesberg could not verify that information because respondent-mother would not sign the necessary release.

In relation to active efforts, counsel for petitioner had the following exchange with Nesberg:

> *Q.* You indicated . . . that you work hard with the agency to make sure they're doing necessary to [sic]–for the family in order to be successful; is that correct?
>
> *A.* Correct.
>
> *Q.* Has the agency done everything that . . . has been requested of them or you're not requested but have they been doing everything possible to make this family successful?
>
> *A.* Yes. . . . I'm in regular contact with the agency. I have been in contact with you. Any ideas that I have I let . . . you both know and that's honestly one of the first things they're doing. They're . . . doing what I'm asking them to do so it's . . . never been an issue.
>
> *Q.* So, the agency has taken the active efforts in order to make this family successful?
>
> *A.* Yes.

A visitation supervisor, who supervised respondent-mother's visits with the children, testified that respondent-mother always attended the visits except when she did inpatient substance abuse treatment. The visitation supervisor said that the visits occurred at respondent-mother's grandmother's home, and respondent-mother's grandmother (not respondent-mother) prepared the home and food for the children. After the most recent visit, the visitation supervisor drove respondent-mother home, and respondent-mother made multiple statements threatening to harm the caseworker for her case. The visitation supervisor reported the threats to the police.

The visitation supervisor also supervised respondent-father's parenting time visits. She said that, overall, respondent-father "is more kind of like a fun uncle," "not watching all the kids at the same time." She noted, however, that he made the children meals and never inappropriately disciplined them, screamed, or used force.

On the basis of the evidence presented, the court found that termination of respondents' parental rights was proper under MCL 712A.19b(3)(c)(*i*) and (*ii*), and that termination was in the children's best interests.

Respondents now appeal.

## II. ACTIVE EFFORTS

Respondent-mother raises a single challenge on appeal. She claims that the DHHS failed to make active efforts to preserve the Indian family as required under state and federal law. More specifically, respondent-mother challenges whether the DHHS made active efforts to provide respondent-mother with mental health services.

The ICWA and the MIFPA—enacted to protect the best interests of Indian children and the stability of Indian families, *In re Williams*, 501 Mich 289, 294; 915 NW2d 328 (2018)—require proof that active efforts were made to prevent the breakup of the Indian family. MCL 712B.15(2); 25 USC 1912(d). That active efforts were made must be established by clear and convincing evidence. *In re England*, 314 Mich App 245, 259-260; 887 NW2d 10 (2016).

This Court reviews for clear error a trial court's factual finding that active efforts were proved by clear and convincing evidence. *In re Beers*, 325 Mich App 653, 680; 926 NW2d 832 (2018). A decision is clearly erroneous when, despite evidence supporting the decision, the reviewing court is left with the definite and firm conviction that a mistake was made. *In re Williams*, 286 Mich App 253, 271; 779 NW2d 286 (2009). The interpretation and application of statutes is a question of law, reviewed de novo. *In re Beers*, 325 Mich App at 680.

"Active efforts" are defined as "actions to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and to reunify the Indian child with the Indian family." MCL 712B.3(a). "Active efforts require more than a referral to a service without actively engaging the Indian child and family." *Id*. They "require affirmative, as opposed to passive, efforts," and are necessarily more than "reasonable efforts." *In re JL*, 483 Mich 300, 321; 770 NW2d 853 (2009). "Active efforts involve a caseworker who takes a client through the steps of a treatment plan rather than requiring the client to perform the plan on his or her own." *In re Beers*, 325 Mich App at 680, citing *In re JL*, 483 Mich at 321. While the active-efforts bar is high, "there comes a time when the [DHHS] or the tribe may justifiably pursue termination without providing additional services." *In re JL*, 483 Mich at 326-327.

While the record is not entirely clear about exactly when and what services respondent-mother received to address her mental health issues, this is largely due to respondent-mother's lack of candor and cooperation, as well as her continual refusal to sign the necessary releases. That said, the information that can be gleaned from the record shows that the DHHS made active efforts to assist respondent in addressing her mental health issues.

In December 2020, CPS provided a service to respondents entitled "Access Psychological." In January 2021, respondent-mother told a CPS worker that she was in counseling but refused to provide verification of the services. Later, respondent-mother was referred to Boot Lake Counseling Service, and an intake was scheduled for January 5, 2022, but respondent-mother was a no call-no show. The court ordered respondent-mother to follow through with that service, but

she did not. A case service plan states that respondents received counseling services from the tribe at some point in 2022. At some other unknown time, an unknown clinician diagnosed respondent-mother with depression and anxiety. Respondent-mother had prescriptions for medications to address some of her mental health issues, but her drug screens showed that she did not consistently take those medications. A report prepared in November 2022 states that respondent represented that she was receiving therapy at Bell Women's Care. While the same report states that respondent-mother signed a release for this service, there is no verification of this service is in the record.

In January or February 2023, respondent-mother received a psychological evaluation from Dr. Silverstein, who diagnosed respondent-mother with a personality disorder, opioid use disorder, and stimulant use disorder. The caseworker testified that respondent-mother did an intake with Pathways in January 2023 but sabotaged the appointment by saying that her only mental health issue was her caseworker, essentially denying that she had any mental health issues. Pathways consequently denied respondent-mother service. The caseworker subsequently encouraged respondent-mother to try again with Pathways to provide them with "more accurate information about her current mental health needs." Respondent-mother did not pursue services with Pathways again until shortly before the termination trial was set to begin.

After Pathways denied her service, respondent-mother told the caseworker that she had a list of therapists in the community who could provide her treatment but she was unsure which ones would accept her insurance. The caseworker asked respondent to provide her the list and set up a time to meet with the caseworker, and the caseworker would assist respondent-mother in calling the therapists to see which ones would accept respondent-mother's insurance. Unfortunately, respondent-mother delayed setting up the meeting. When the meeting finally took place, respondent-mother only agreed to allow the caseworker to attend a different meeting between respondent-mother and a tribal worker at which they planned to discuss potential mental health treatments.

At that meeting, the tribal worker provided respondent-mother with information about counseling services, and respondent-mother represented that she was pursuing counseling with a tribal counselor. It does not appear that any such counseling sessions occurred, and respondent-mother later represented that she was still on the waitlist for tribal counseling services. Respondent-mother unfortunately refused to sign the necessary releases for this service, so Nesberg could not verify whether respondent-mother was actually on the waiting list. The caseworker additionally offered to schedule a psychological assessment for respondent-mother, but respondent-mother was not amenable to the idea.

Shortly before the termination trial was set to begin, respondent-mother completed a new intake with Pathways on July 3, 2023. She would not sign a release for caseworkers to gather information about this service, however.

The above facts demonstrate that respondent-mother received active efforts to address her mental health issues. Contrary to respondent-mother's assertion on appeal, respondent-mother was plainly provided "actual access" to mental health services. The problem in this case was not a failure to provide respondent-mother with access to mental health services but respondent-mother's reluctance to participate in the services offered. The record also belies respondent-mother's assertion on appeal that "there was no evidence that caseworkers provided [respondent-

mother] with anything more than referrals for mental health services." The record is replete with instances in which the caseworker went beyond merely referring respondent-mother to services, as recounted above.

A frequent obstacle to providing mental health services to respondent-mother in this case was her lack of candor. She told the caseworker at various points that she was already in counseling, which appears to never have been true—respondent-mother refused to sign the necessary releases so the caseworker could never verify the services. At other points, respondent-mother caused delay in receiving services to address her mental health by refusing to be forthright. For instance, respondent-mother caused Pathways to deny her services at the January 2023 intake session by essentially denying that she had any mental health issues.[2]

Respondent-mother complains on appeal that the DHHS did not follow-up after the court offered to sign a letter to tribal counseling services emphasizing the need for respondent-mother's enrollment in the service, but this complaint rings hollow. Respondent-mother refused to sign the necessary release, so no one was able to confirm whether respondent-mother was even on the waitlist for tribal counseling services. Nesberg, moreover, testified that she always let the DHHS know when she had any suggestions for services, and that the DHHS always acted on Nesberg's ideas "first thing[]." She further testified that the DHHS provided active efforts in this case.

In sum, it is clear that the problem throughout this case was not a failure to provide respondent-mother with access to mental health services but respondent-mother's refusal to engage in the services offered. No one could force respondent-mother to meaningfully participate in services. The DHHS made affirmative efforts to assist respondent-mother in treating her mental health issues; it did not leave respondent-mother to try to navigate her treatment plan on her own but attempted to assist her every step of the way. On this record, the trial court did not clearly err when it found that active efforts were proved by clear and convincing evidence.

III. RESPONDENT-FATHER'S TERMINATION

Respondent-father argues on appeal that the DHHS presented insufficient evidence to support the termination of his parental rights. Contesting the trial court's finding of a statutory ground for termination, respondent-father contends that the trial court gave too much weight to (1) his suicidal ideations that required inpatient psychiatric care and (2) his criminality. Contesting the trial court's finding that termination was in the children's best interests, respondent-father contends that the trial court erred by focusing too much on respondent-father's conduct, did not focus on each child individually, and failed to consider that the children were in a relative placement.

---

[2] On appeal, respondent-mother claims that her actions at the Pathways intake session were "[i]ronically" attributable to her mental health issues. It is not apparent that this is true, but regardless, after the denial, the caseworker encouraged respondent-mother to try again with Pathways to provide them with "more accurate information about her current mental health needs." This goes beyond a mere referral, contrary to respondent-mother's assertion on appeal.

## A. STATUTORY GROUNDS

A lower court's finding that a statutory ground for termination was proved by clear and convincing evidence is reviewed for clear error. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010).

The trial court terminated respondent-father's parental rights under MCL 712A.19b(3)(c)(*i*) and (*ii*). Those subsections provide that a court may terminate a parent's parental rights if it finds by clear and convincing evidence that

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

> (*ii*) Other conditions exist that cause the child to come within the court's jurisdiction, the parent has received recommendations to rectify those conditions, the conditions have not been rectified by the parent after the parent has received notice and a hearing and has been given a reasonable opportunity to rectify the conditions, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age. [MCL 712A.19b(3)(c)(*i*) and (*ii*).]

Because this case involved Indian children under the ICWA and MIFPA, in addition to finding at least one statutory ground for termination, the trial court needed to find beyond a reasonable doubt that continued custody of the children by respondent-father was likely to result in serious emotional or physical harm to the children before it could terminate respondent-father's parental rights. MCL 712B.15(4). See also *In re England*, 314 Mich App at 253.

It is undisputed that 182 or more days had elapsed since the initial dispositional order was entered. The court took jurisdiction over the children as to respondent-father based on the neglectful health and safety issues in the home. Respondent-father never remedied the unsafe conditions of the home or found housing suitable for his family. Indeed, the record, particularly the trooper's testimony at the termination trial, suggests that the unsanitary conditions of the home only worsened as the case progressed. Given respondent-father's general failure to comply with his court-ordered case service plan, there was no chance he would rectify the housing situation within a reasonable time given the children's ages, supporting termination under MCL 712A.19b(3)(c)(*i*).

As to MCL 712A.19b(3)(c)(*ii*), additional conditions came to light during the pendency of these proceedings, including respondent-father's ongoing criminality, mental health issues, and substance abuse. Respondent-father was arrested once in November 2022 and twice in March 2023. His arrests revolved around possessing weapons and controlled substances. Respondent-father repeatedly violated the conditions of his probation by drinking alcohol and using controlled substances. He was incarcerated for a time in March 2023, and again on June 18, 2023. At the

time of the termination hearing, it was believed that respondent-father could be imprisoned for an extended period on his latest charges. In addition to these charged offenses, respondent-father's criminality included using illegal substances and threatening to kill respondent-mother, the foster parents, other family members, and a drug dealer.

Concerning mental health, respondent-father expressed suicidal and homicidal ideations beginning in November 2022. During this time, respondent-father also hallucinated, claiming that he could not attend parenting times because he had "bugs . . . coming out of his mouth." He refused treatment after trying to commit suicide in December 2022. Respondent-father agreed to get treatment in January 2023 and was hospitalized for three days. During his stay, respondent-father apparently underwent a psychological or psychiatric evaluation, but he refused to sign releases to give the caseworkers access to that information. He went to the emergency room once more at the end of January 2023 due to continuing mental health concerns, but allegedly did not meet the criteria for a psychiatric commitment. Respondent-father briefly attended counseling at Pathways after his hospital release but then suddenly stopped going. With this service too, respondent-father refused to sign releases for the caseworkers to access necessary information.

As for respondent-father's issue with substance abuse, references to his substance abuse abound in the lower court record. Respondent-father claimed that he had not used illegal drugs since before his children were born but started again after they were removed from his care. Respondent-father repeatedly tested positive for methamphetamine, amphetamines, cocaine, and marijuana. He admitted to drinking alcohol daily. Respondent-father may have also abused respondent-mother's prescription medication, as those substances were found in his system on more than one occasion. And his substance abuse affected his ability to effectively parent, even while the children were not in his care—respondent-father once attended parenting time under the influence. Workers had trouble communicating with respondent-father on multiple occasions because he was incoherent and under the influence. Respondent-father continued to test positive for substances up until his June 18, 2023 incarceration.

On appeal, respondent-father tries to minimize his mental health issues, claiming that "there is no evidence in the record that ongoing mental health concerns were an issue for" respondent-father. Yet the record plainly belies this assertion. Respondent-father experienced significant mental health crises during the case, and nothing in the record supports that he adequately addressed the underlying issues to prevent future episodes.

Respondent-father likewise tries to minimize his criminality, emphasizing that "none of the charges involve abuse of the children, nor are they assaultive in nature, and finally were not alleged to have been committed in the presence of the children." While true, it does not change the fact that respondent-father's criminality became an issue during these proceedings and remained an issue by the time of the termination trial. His criminality, moreover, seemed largely tied to his abuse of illegal substances. Respondent-father offers nothing to rebut that his substance abuse became a significant barrier during these proceedings and that it remained a barrier at the time of the termination trial.

Given the longstanding nature of these issues, respondent-father's refusal to address them, and the fact that the issues got worse during the pendency of these proceedings, the DHHS not only established that these conditions continued to exist, but also that respondent-father could not

rectify them within a reasonable time. Termination was thus supported under MCL 712A.19b(3)(c)(*ii*).

For reasons similar to those supporting the trial court's findings of statutory grounds for termination, the trial court did not clearly err when it found beyond a reasonable doubt that continued custody of the children by respondent-father was likely to result in serious emotional or physical harm to the children. Respondent-father did not have a habitable home for the children to live in, he continued to have significant unresolved mental health issues, he was engaged in ongoing criminality that could potentially subject the children to harm, and he had unresolved issues with substance abuse that affected his ability to safely parent the children. Any one of these issues posed a risk of emotional or physical harm to the children, but that all of the issues remained unresolved supported the trial court's finding beyond a reasonable doubt that continued custody of the children by respondent-father was likely to result in serious emotional or physical harm to the children. The trial court accordingly did not clearly err when it found that (1) a statutory ground for termination was proved by clear and convincing evidence and (2) the requirements of MCL 712B.15(4) were proved beyond a reasonable doubt.

## B. BEST INTERESTS

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012), citing MCL 712A.19b(5) and MCR 3.977(E)(4). "[W]hether termination of parental rights is in the best interests of the child must be proven by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). A trial court's finding that termination of parental rights is in a child's best interests is reviewed for clear error. *In re Jones*, 286 Mich App 126, 129; 777 NW2d 728 (2009).

A trial court's best-interest decision must be based on evidence gleaned from the whole record. *In re Brown/Kindle/Muhammad*, 305 Mich App 623, 637; 853 NW2d 459 (2014). Relevant factors include "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts Minors*, 297 Mich App at 41-42 (citations omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014). "Other considerations include the length of time the child was in care [and] the likelihood that the child could be returned to her parents' home within the foreseeable future, if at all." *In re Payne/Pumphrey/Fortson*, 311 Mich App 49, 64; 874 NW2d 205 (2015) (quotation marks and citation omitted). Placement with a relative weighs against termination. *In re Olive/Metts Minors*, 297 Mich App at 43. "With respect to the trial court's best-interests determination, we place our focus on the child rather than the parent." *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016).

First, contrary to respondent-father's contention, the children's ongoing relative placement was considered before terminating his parental rights. The foster parents had changed their minds and were no longer willing to permanently care for the children because of respondent-mother's

threats and behavior. No other suitable family member was located and the children would likely be placed with a local family approved by the tribe.

Turning to the substance of the lower court's best-interest determination, the court did not clearly err by finding that the record evidence preponderated in favor of termination. By the time of the termination hearing, respondent-father had not complied with any component of his case service plan and was in a much worse condition than when the case began in September 2021. There was a strong likelihood that respondent-father would soon be imprisoned for an extended period for various offenses he committed in November 2022 and March 2023. While respondent-father shared a strong bond with the children, his mental health issues and incarcerations kept him from many parenting-time sessions. He attended at least one parenting-time session under the influence. Respondent-father lived with the children in unsanitary conditions before their removal from his care, and he made no attempt to rectify that condition to improve his chances of regaining custody. Respondent-father likewise made no attempt to achieve sobriety so that he could safely parent the children. Despite his love for the children, the record is clear that respondent-father could not provide a safe environment for the children or safely supervise them. And given his delays in making any effort to rehabilitate, respondent-father would not be able to do so in a reasonable time. The children needed finality and stability, and they could not continue waiting for respondent-father to demonstrate that he could provide that.

Respondent-father's final complaint that the court should have considered the best interests of each child separately does not warrant relief. "[I]f the best interests of the individual children *significantly* differ, the trial court should address those differences when making its determination of the children's best interests." *In re White*, 303 Mich App at 715. Otherwise, a court does not err "if it fails to explicitly make individual and—in many cases—redundant factual findings concerning each child's best interests." *Id*. at 716. Although the two eldest children had a closer bond with respondent-father, the children would be in equal danger if returned to respondent-father's custody. Respondent-father's unaddressed substance abuse, mental health issues, and ongoing criminality placed each child at risk. Separate consideration was therefore not required.

## IV. CONCLUSION

The DHHS and tribal service providers made active efforts to preserve the Indian family. Respondent-mother's lack of participation in much-needed mental health services was not due to any failure on the agencies' part. The DHHS provided sufficient evidence to support finding statutory grounds for terminating respondent-father's parental rights and finding termination to be in the children's best interests.

Affirmed.

/s/ Kathleen Jansen
/s/ Christopher M. Murray
/s/ Colleen A. O'Brien

-13-